eFiled
7/28/2026 4:21 PM
Superior Court
of the District of Columbia

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

MATEO DUNNE
8701 Camden Street
Alexandria, Virginia 22308,

PLAINTIFF,

v.

TRAVIS ADKINS, in his individual capacity,
SERVE: 130 Waltman Place NE
Washington, DC 20011,

MATHIEU ZAHUI, in his individual capacity,
SERVE: 10727 Rippon Lodge Drive
Fairfax, Virginia 22032, and

ELISABETH FELEKE, in her individual capacity,
SERVE: 6107 Sherborn Lane
Springfield, Virginia 22152,

DEFENDANTS.

Case No. 2026-CAB-005244

Judge ____________________

Calendar __________________

JURY TRIAL DEMANDED

**COMPLAINT**

COMES NOW PLAINTIFF Mateo Dunne ("DUNNE" or "PLAINTIFF"), by and through undersigned counsel and pursuant to Rules 3 and 8 of the Rules of the Superior Court of the District of Columbia, and as causes of action against DEFENDANT Travis Adkins ("ADKINS") in his individual capacity, DEFENDANT Mathieu Zahui ("ZAHUI") in his individual capacity, and DEFENDANT Elisabeth Feleke ("FELEKE") in her individual capacity (collectively, "DEFENDANTS") avers as follows:

**NATURE OF THE ACTION**

1. On November 19, 2021, PLAINTIFF, newly appointed as General Counsel of the United States African Development Foundation ("USADF" or "Corporation"), met with ZAHUI,



EXHIBIT A

Director of Financial Management for USADF (also known as "Managing Director of Finance and Administration" and "Chief Financial Officer"). DUNNE was investigating anonymous allegations of egregious corruption at the Corporation, and he sought to ensure appropriate legal oversight of Corporation procurement actions. For reasons now made abundantly clear by his guilty plea, ZAHUI refused to cooperate with the investigation or to allow the Office of General Counsel to review Corporation procurement actions. FELEKE, Chief Program Officer and Acting President and Chief Executive Officer ("P/CEO") for USADF—along with ADKINS, who was appointed as P/CEO of USADF on January 19, 2022—sided with ZAHUI in an apparent effort to thwart DUNNE's investigation and conceal rampant fraud, waste, and abuse.

2. Before his investigation was shut down by DEFENDANTS, PLAINTIFF was able to substantiate most of the anonymous allegations. Among other findings, his investigation disclosed grants provided to personal connections, grants provided to non-African enterprises, and a toxic work environment that involved potential abuse and harassment. PLAINTIFF also discovered further evidence of wrongdoing, including credit card fraud, violations of travel rules and regulations, and serious procurement irregularities.

3. Despite DEFENDANTS' stonewalling, and as a direct result of DUNNE's whistleblowing to Congress and to the Office of Inspector General for the United States Agency for International Development ("USAID OIG"), ZAHUI pled guilty on February 23, 2026, in *United States v. Zahui*, No. 26-cr-16 (JEB) (D.D.C.), to Federal charges of receiving gratuities as a public official and making false statements to Federal law enforcement officers—arising from cash payments he accepted from a Corporation contractor between at least August 2019 and August 2022, fraudulent pass-through invoices he approved for that contractor's company between at least June 2020 and December 2023, and lies he told Federal agents in January 2024.

4. As alleged in detail below, ZAHUI's crimes were not an isolated departure. They were committed in, through, and under the protection of the Corporation, which DEFENDANTS operated as a racketeering enterprise:

- ZAHUI extracted cash from a Corporation contractor whose marked-up, pass-through invoices he approved;
- DEFENDANTS dismantled and kept vacant the legal oversight function that would have detected the scheme; and
- When the Corporation's newly appointed General Counsel (PLAINTIFF) began to perform precisely that oversight in November 2021, DEFENDANTS obstructed his investigation, suppressed his findings, retaliated against him for reporting to the USAID OIG, drove him from Federal service, interfered with his subsequent employment, and defamed him to Federal law enforcement and to the world.

5. This case arises out of DEFENDANTS' reprehensible, illegal, and tortious mistreatment of PLAINTIFF between his exposure and pursuit of the corruption allegations in 2021-2022 and his 2026 vindication through ZAHUI's criminal conviction, and out of the pattern of racketeering activity through which DEFENDANTS conducted the affairs of the Corporation during that period.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction over this action pursuant to DC Code § 11-921(a)(6), which vests this Court with jurisdiction over civil actions at law and in equity brought in the District of Columbia.

7. This Court has concurrent subject-matter jurisdiction over PLAINTIFF's claims under RICO, 18 U.S.C. §§ 1961–1968. The jurisdictional grant of 18 U.S.C. § 1964(c) is permissive, and state courts—including the courts of the District of Columbia—possess concurrent jurisdiction over civil RICO claims. *Tafflin v. Levitt*, 493 U.S. 455 (1990).

8. This Court has personal jurisdiction over DEFENDANT ADKINS pursuant to DC Code § 13-422, because ADKINS is domiciled in, and maintains his principal place of residence in, the District of Columbia.

9. This Court has personal jurisdiction over DEFENDANTS FELEKE and ZAHUI pursuant to DC Code § 13-423(a)(1), (a)(3), and (a)(4), because each transacted business in the District of Columbia; caused tortious injury in the District of Columbia by acts and omissions in the District of Columbia; and caused tortious injury in the District of Columbia by acts and omissions outside the District while regularly doing and soliciting business and engaging in a persistent course of conduct in the District. Each of the acts and publications alleged herein was committed in, directed at, or published from the District of Columbia, where the Corporation maintains its headquarters and where each DEFENDANT was employed (along with PLAINTIFF).

10. Venue is proper in this Court because the acts and omissions giving rise to PLAINTIFF's claims occurred in substantial part in the District of Columbia.

11. The claims asserted herein are asserted against ADKINS, ZAHUI, and FELEKE solely in their individual capacities, for their own personal, intentional, malicious, and tortious conduct. No DEFENDANT is sued in his or her official capacity, and no claim is asserted against the United States, against USADF, or against any officer or employee of either in an official capacity.

12. The acts and omissions of DEFENDANTS alleged herein were not of the kind that DEFENDANTS were employed to perform; were not actuated, in whole or in any significant part, by any purpose to serve USADF; were undertaken in defiance of, and in violation of, the statutes, regulations, and agency policies governing DEFENDANTS' conduct; were undertaken for DEFENDANTS' personal purposes, including the concealment of ZAHUI's own crimes against the Corporation, the preservation of the benefits each DEFENDANT derived from the corrupt operation of the Corporation, the protection of DEFENDANTS' positions and reputations, and personal retribution against PLAINTIFF

**THE PARTIES AND PERTINENT ENTITIES**

13. PLAINTIFF is an adult under no legal disability and is a citizen, resident, and domiciliary of the Commonwealth of Virginia. During his employment with USADF, PLAINTIFF's legal name was Matthew Stanton Dunne III, and he was known as Mateo Dunne. PLAINTIFF's legal name is now Mateo Oramas Reyes Dunne. Documents referenced herein that identify "Matthew Dunne" or "Matthew Stanton Dunne III" refer to PLAINTIFF. Since 2005, PLAINTIFF has been a member in good standing of the Bar of the District of Columbia. PLAINTIFF is an elected member of the Fairfax County School Board. PLAINTIFF was elected to the School Board on November 7, 2023.

14. PLAINTIFF completed an ambitious four-year, joint-degree program at Emory University.

15. PLAINTIFF graduated from Emory University with a B.A. *summa cum laude* in History and French and an M.A. in History in 1998. PLAINTIFF completed the research for his M.A. thesis at the French military archives in Paris during his junior year.

16. PLAINTIFF completed an ambitious four-year, joint-degree program at Georgetown University.

17. PLAINTIFF graduated with Distinction from the Georgetown University School of Foreign Service with a M.S. in Foreign Service. PLAINTIFF completed the International Business Honors Program at the Georgetown University School of Foreign Service. During his graduate studies, PLAINTIFF served as a senior editor with the Georgetown Journal of International Affairs.

18. PLAINTIFF graduated from the Georgetown University Law Center with a J.D. and a Certificate in World Trade Organization Studies. During law school, PLAINTIFF received CALI Excellence for the Future Awards in International Law, International Trade Law, International Business Transactions/Project Finance, and Latin American Legal Institutions.

19. During law school, PLAINTIFF served as a Fellow with the Institute for International Economic Law and as a senior editor with the Georgetown Journal of International Law (formerly Law and Policy in International Business). PLAINTIFF completed legal internships with the U.S. Agency for International Development's Office of General Counsel, the U.S. Senate Commerce Committee's Consumer Affairs and Telecommunications Subcommittees, and the Feinberg Group. PLAINTIFF also completed an internship with the Office of the United States Trade Representative's Office of Intellectual Property, where he supported the preparation of the annual Special 301 report on foreign intellectual property rights regimes.

20. From August 2002 to November 2002, PLAINTIFF held a legal internship with the Office of the U.S. Trade Representative in Geneva, Switzerland, where he supported attorneys engaged in international trade litigation before the World Trade Organization.

21. From December 2002 to September 2003, PLAINTIFF served as a law clerk on the United States Court of Appeals for the Fifth Circuit in New Orleans, Louisiana.

22. From October 2003 to December 2003, PLAINTIFF was only the second American to serve as a law clerk (stagiaire) to the World Trade Organization's Appellate Body, which is considered the supreme court of international trade law.

23. From January 2004 to March 2007, PLAINTIFF served as a senior associate for the law firm of Paul Hastings LLP, where he specialized in complex litigation, international arbitration, trade compliance, and national security law.

24. From April 2007 to December 2009, PLAINTIFF served as a senior associate for the law firm of King & Spalding LLP, where he specialized in complex litigation, trade compliance, and national security law.

25. From January 2010 to April 2012, PLAINTIFF served as Deputy Chief Counsel for the Advanced Research Projects Agency-Energy ("ARPA-E"), a new $200 million research and development ("R&D") agency within the U.S. Department of Energy that was modeled on the Defense Advanced Research Projects Agency ("DARPA"). For 18 months, PLAINTIFF served as Acting Chief Counsel of ARPA-E and supervised a team of attorneys and legal interns. PLAINTIFF played a leading role in the establishment of ARPA-E as a center of business excellence. PLAINTIFF received monetary awards in recognition of his superior performance.

26. During his tenure at ARPA-E, PLAINTIFF completed the Graduate School USA's Executive Potential Program, a 12-month leadership development program for high-potential executives.

27. In April 2012, PLAINTIFF received a noncompetitive, non-political appointment as Chief Operations and Strategic Innovation Officer (Chief Innovation Officer) for the Office of

Energy Efficiency and Renewable Energy ("EERE"), a $2 billion research, development, demonstration, and deployment ("RDD&D") agency within the U.S. Department of Energy. In this capacity, PLAINTIFF directed nationwide and enterprise-wide business operations, to include acquisition, budget formulation and execution, environmental oversight, financial assistance, human resource services, information technology services, legal services, and national laboratory oversight. PLAINTIFF supervised several senior executives and staff directly, and he led a workforce of approximately 300 Federal employees and contractors in three states. PLAINTIFF led comprehensive business reforms at EERE and received the Secretary's Appreciation Award for improvements to the agency's management and operations. PLAINTIFF received monetary awards in recognition of his superior performance.

28. During his tenure at EERE, PLAINTIFF completed the prestigious, one-month Leadership for a Democratic Society leadership development program at the Federal Executive Institute in Charlottesville, Virginia.

29. From April 2014 to April 2018, PLAINTIFF served as General Attorney for the U.S. Army Legal Services Agency, which is the largest law firm within the U.S. Department of Defense. PLAINTIFF served as one of the lead attorneys representing the consumer interests of the U.S. Department of Defense and all other Federal Executive Agencies before the Federal Communications Commission, the Federal Energy Regulatory Commission, and state public utility commissions in rate cases and regulatory proceedings concerning the electric, natural gas, and telecommunications sectors. PLAINTIFF advised military installations across the country on technology transitions in the energy and telecommunications sectors in order to ensure the reliability and resiliency of critical infrastructure. PLAINTIFF received monetary, on-the-spot, and time-off awards in recognition of his superior performance.

30. From April 2018 to October 2021, PLAINTIFF served as Associate General Counsel for the Missile Defense Agency, a $10 billion Defense agency within the U.S. Department of War. In this capacity, PLAINTIFF served as the lead attorney for appropriations, legislation, international law, and space law.

31. From 2018 to 2019, PLAINTIFF completed the necessary coursework for a LL.M in Air and Space Law at the University of Mississippi School of Law, but he delayed the completion of his thesis and the receipt of his degree until 2025.

32. DEFENDANT ADKINS is an adult under no legal disability and, on information and belief, is a citizen, resident, and domiciliary of the District of Columbia. ADKINS served as P/CEO of USADF from January 18, 2022 through February 10, 2025.

33. DEFENDANT ZAHUI is an adult under no legal disability and, on information and belief, is a citizen, resident, and domiciliary of the Commonwealth of Virginia. ZAHUI served as Director of Financial Management for USADF from 2017 to February 2026 (and as a USADF employee since 2010). From on or about February 10, 2025, ZAHUI also served as a member of the three-member leadership committee, described below, created by the USADF Board of Directors to perform the functions of the P/CEO. On February 23, 2026, ZAHUI pled guilty to Federal criminal charges as described below.

34. DEFENDANT FELEKE is an adult under no legal disability and, on information and belief, is a citizen, resident, and domiciliary of the Commonwealth of Virginia. FELEKE has served as Chief Program Officer of USADF since November 2020, and served as Acting P/CEO from May 17, 2021 to January 17, 2022. On or about February 10, 2025, immediately upon ADKINS' resignation, the Board of Directors created, by official Board resolution, a three-member leadership committee—composed of FELEKE, ZAHUI, and General Counsel Kerline

Perry—to perform the functions of the P/CEO until the Board appointed a new P/CEO. The creation, composition, and function of that committee have been confirmed under penalty of perjury by former Board Chairman Jack Leslie ("Leslie") in a declaration executed March 6, 2025. From on or about February 10, 2025, FELEKE and ZAHUI were thus two of the three officials in whom the executive functions of the Corporation were vested.

35. The United States African Development Foundation is a United States government corporation established pursuant to 22 U.S.C. § 290h *et seq.* USADF is not a party to this action.

36. USADF was established by Congress to support and invest in African-owned and African-led enterprises. USADF makes grants to African organizations consistent with USADF's statutory purposes, with an annual grant budget of approximately $30 million. The African Development Foundation Act vests the management of USADF in a Board of Directors, which in turn appoints the President of USADF.

## STATEMENT OF FACTS APPLICABLE TO ALL CLAIMS

### *A. THE AGENCY'S OVERSIGHT STRUCTURE AND THE OFFICE OF GENERAL COUNSEL*

37. USADF's Office of General Counsel is an integral part of the Corporation's management team, with the goal of ensuring that USADF and its Board operate in compliance with the Corporation's statutory mandate and applicable Federal laws and regulations.

38. The functions of the Office of General Counsel include leading the Corporation's compliance and due diligence review of grant agreements; reviewing and approving implementing-partner agreements, local country personnel contracts, and field-office leases; leading grant dispute resolution related to grant audits and mismanagement of funds; negotiating

and managing the Corporation's portfolio of public-private partnerships and co-funding agreements; serving as Designated Agency Ethics Official; and serving as Chief FOIA Officer.

39. Many of the functions of the Office of General Counsel are inherently governmental functions that, by law, may be performed only by a Federal employee. These include the approval of contract documents; the determination whether contract costs are reasonable, allocable, and allowable; the approval of agency responses to Freedom of Information Act requests; the provision of final opinions concerning the application of the conflict-of-interest laws; the certification of public and confidential financial disclosure forms; the determination of agency ethics policies; the referral of matters to the USAID OIG for investigation; and the referral of criminal matters to the U.S. Department of Justice ("USDOJ").

***B. THE AGENCY WAS WARNED IN WRITING, BEFORE PLAINTIFF WAS HIRED, THAT IT HAD NO OFFICER CAPABLE OF PERFORMING ITS LEGAL OVERSIGHT FUNCTIONS***

40. On August 10, 2021—more than two months before PLAINTIFF commenced employment—Nina-Belle Mbayu ("Mbayu"), then the sole Federal-employee attorney in the Office of General Counsel, delivered a written memorandum to FELEKE, then serving as Acting P/CEO, captioned "Office of General Counsel Transition/CY2020 and 2021" ("Mbayu Memorandum"). FELEKE was the addressee. The Mbayu Memorandum was therefore actual, written, and contemporaneous notice to FELEKE personally of every deficiency described in this Section.

41. The Mbayu Memorandum stated that from January 1, 2020 forward, Mbayu had led the Office of General Counsel "as its sole staff member" responsible for the full scope of the Corporation's legal functions, initially at the GS-12 level and, from September 2020, at the GS-13 level. Mbayu acknowledged that she lacked the experience and expertise to serve as General

Counsel because she had graduated from law school in May 2016, only 3.5 years before her designation as Acting General Counsel.

42. DEFENDANTS hired an equally junior attorney as a contractor to support the Office of General Counsel, but this was not a solution because contractors can't perform inherently governmental functions. Mbayu noted this limitation "is especially true in relation to personnel, contracting, ethics, and FOIA requirements for the agency," so the contractor's "scope of support to OGC is appreciated but inherently limited by law." Mbayu attached supporting authority, including the 2014 Congressional Research Service report *Definitions of "Inherently Governmental Function" in Federal Procurement Law and Guidance*. The Mbayu Memorandum recorded that "prior to [her] tenure, OGC had two Federal employees at the GS-15 level, and contracted additional legal assistance when required," and that Mbayu had served alone for approximately twenty months "even after multiple requests for top-line support in the form of a General Counsel to fairly balance the workload." Those requests were denied by former P/CEO CD Glin ("Glin") and, after May 2020, by FELEKE.

43. The Mbayu Memorandum expressly warned the Corporation that the equally junior attorney (who graduated from law school in May 2017) hired as a contractor to support the Office of General Counsel—in lieu of a senior attorney hired as a Federal employee to serve as General Counsel—was not a solution because as a contractor, she could not lawfully perform the Corporation's core oversight functions. The Mbayu Memorandum explained that contractors "are prohibited [by law] from performing 'inherently government functions.'"

44. The Mbayu Memorandum supplied a direct institutional comparator. It reported that within the same period, USADF's sister agency, the Inter-American Foundation, had hired a permanent General Counsel "within four months" of a departure, returned an Associate General

Counsel to full-time status, hired a full-time contract paralegal, and planned to hire an ethics counsel as a Federal employee. Mbayu observed that because "IAF and USADF have similar congressional mandates, amount of projects, and similar Washington HQ staff, this comparator shows the necessity for 1) an adequately staffed GC Office, and 2) at least two Federal employees, especially for the purposes of finalizing legal ideas related to and generally performing inherent government functions."

45. The Mbayu Memorandum closed with an express warning that the Office of General Counsel would soon be incapable of performing inherently governmental functions and ensuring strict compliance with applicable laws and regulations. Mbayu had announced her intention to resign at the close of Fiscal Year 2021, so "there will be no Federal employee at USADF who is licensed as an attorney able to provide the full scope of OGC duties as required for a successful transition."

46. The Corporation was therefore on written notice, before PLAINTIFF was hired, that the very acts for which it later suspended, investigated, and constructively discharged PLAINTIFF—reviewing procurement actions, administering the ethics program, reviewing confidential and public financial disclosures, and referring misconduct to the USAID OIG—were functions that only a Federal-employee attorney could perform, and that the Corporation had for nearly two years maintained itself in a condition in which no attorney of sufficient experience, expertise, and seniority was in place to perform them.

47. The prolonged vacancy in the Office of General Counsel was not the product of inadvertence, budgetary constraint, or ordinary hiring delay. It was maintained notwithstanding repeated written requests to fill it, notwithstanding written notice of its legal consequences, and

notwithstanding a sister agency's demonstration that the position could be filled quickly. (Indeed, PLAINTIFF was hired as General Counsel within approximately three months.)

48. The periods during which USADF had no General Counsel capable of exercising independent procurement and ethics oversight coincide with the period of ZAHUI's criminal conduct alleged in Section N below. ZAHUI has admitted, and the judgment of conviction establishes, that he accepted gratuities from a Corporation contractor from June 2020 through December 2023. During most of that period, the only interval in which USADF employed a GS-15 General Counsel was PLAINTIFF's eighty-nine-day tenure (before his suspension for 162 days). It was during that brief interval, on November 19, 2021, that ZAHUI told PLAINTIFF that the review of Corporation procurement contracts was "not in [PLAINTIFF's] job description" (even though it was, in fact, explicitly set forth in PLAINTIFF's job description).

49. On information and belief, the vacancy in the Office of General Counsel was created, prolonged, and maintained by DEFENDANTS, and the warnings of the Mbayu Memorandum were disregarded by DEFENDANTS, for the purpose of preventing effective legal, procurement, and ethics oversight of the Corporation's affairs, including the conduct described in Section N below.

50. On April 20, 2023, Kerline Perry became General Counsel for USADF. The General Counsel position description at the time specified the following areas of law to be practiced: "U.S. domestic law and regulations as these relate to international assistance programs and Federal agency administrative operations"; "Federal Personnel and EEO law"; "Appropriations Law"; "laws, regulations, OMB circulars and other rules applicable to Federal grant-making"; and "Federal administrative law (FOIA, Ethics in Government Act, and/or others)." In her published resume, Ms. Perry listed her experience as consisting of: (a) 4 years and 9 months as

Managing Attorney for Legal Services of Northern Virginia, focusing on "housing law, foreclosure, consumer law and bankruptcy"; (b) 4 months as a contractor for the USDOJ where she "assisted with trial preparation" and performed document coding and review; and (c) 1 year and 1 month as a volunteer attorney focusing on "divorce proceedings" and preparing "immigration forms for clients seeking United States citizenship."

### *C. PLAINTIFF'S APPOINTMENT AND THE AUTHORIZED INTERNAL INVESTIGATION*

51. PLAINTIFF was hired as USADF's General Counsel, a GS-15 position, and commenced employment on October 24, 2021. PLAINTIFF also served as the Corporation's Designated Agency Ethics Official ("DAEO"), a position to which he was appointed in writing by FELEKE. Under 5 C.F.R. § 2638.104(c), the DAEO is tasked with primary operational authority over a Federal agency's ethics program, serving as the agency's principal liaison to the U.S. Office of Government Ethics. Specifically, the DAEO is charged with administering public and confidential financial disclosure systems (including OGE Forms 278e and 450) to evaluate, certify, and prevent potential conflicts of interest. In fulfilling these duties, the DAEO provides binding ethics counseling to prospective, active, and former personnel; mandates and conducts required initial and annual ethics training programs; and manages formal conflict resolution measures, including recusals, divestiture orders, and waivers under 18 U.S.C. § 208. Furthermore, the DAEO assists agency executive leadership and the Inspector General in investigating prospective ethics non-compliance and referring potential criminal violations to the USDOJ.

52. Within weeks of his arrival, PLAINTIFF learned—through anonymous online postings and conversations with Corporation staff—of serious allegations of egregious corruption at the Corporation, including but not limited to: (a) grants had been steered to personal connections

of former P/CEO Glin; (b) Corporation funding had been directed to non-African entities; (c) the Corporation maintained a toxic work environment involving potential abuse and harassment; and (d) the Corporation had promoted the products of Herbalife Nutrition ("Herbalife") to indigent populations in Africa while its Chief Executive Officer ("CEO") John Agwunobi sat on the USADF Board of Directors. PLAINTIFF learned of the anonymous postings, which appeared on the website Glassdoor.com, on November 12, 2021, from Senior Advisor Paul Olson. Corporation leadership was already aware of the anonymous postings and had considered paying the website to remove them. PLAINTIFF advised Corporation leadership in writing: "If we do not act proactively to investigate these allegations, there is a risk, hard to quantify, that at some point a current or former disgruntled employee (or anyone with access to Glassdoor.com) will refer these allegations to the USAID OIG [and it] will not regard us favorably if they believe that we tried to sweep such allegations under the rug." That professional assessment was confirmed by subsequent events.

53. On November 13, 2021, PLAINTIFF reported to FELEKE in writing that former P/CEO Glin had failed to file legally required public financial disclosures—"a major issue from an ethics perspective"—and recommended an internal investigation of the allegations, advising FELEKE that the investigation would require several months and additional resources. On November 15, 2021, FELEKE, then Acting P/CEO, authorized an internal investigation of these allegations to be conducted by PLAINTIFF, but denied PLAINTIFF's request for additional resources to conduct the investigation. FELEKE and PLAINTIFF agreed that PLAINTIFF would prepare a memorandum to the Office of the President outlining his findings—a fact FELEKE herself later confirmed in writing to Federal law enforcement.

54. In the course of his investigation, PLAINTIFF interviewed multiple witnesses, including Corporation employees who confirmed the substance of the allegations. Kate Ristroph, a Corporation employee, confirmed in a video-recorded investigative interview that USADF awarded grants to the Association of Ghana Industries on the condition that the grantee, in turn, pay Pyxera Global—a Washington, DC organization at which former P/CEO Glin had previously worked as director of business development—to conduct a study of the artisan sector in Ghana. Ristroph testified that the arrangement placed the Corporation in "that murky territory of like, is this legal?" and that "[t]he CEO specifically directed it."

55. Ristroph further testified that the Corporation trained its African grantees to avoid corruption by awarding contracts only through competitive, arm's-length bidding, yet she was required to instruct those same grantees that Corporation officials in Washington were directing them to do the opposite—a practice that, in her words, "puts me in a compromising position."

56. PLAINTIFF determined that former P/CEO Glin had failed to file mandatory public financial disclosure reports (OGE Form 278) for 2018, 2020, and 2021, in violation of the Ethics in Government Act of 1978, 5 U.S.C. §§ 13101–13111. In addition, PLAINTIFF determined that Glin had failed to disclose his position on the Board of Directors for Root Capital in his 2019 public financial disclosure report, which had received funding from USADF during Glin's tenure. To avoid any potential conflicts of interest, Glin should have recused himself from any involvement in decisions on funding for entities with which he held outside positions.

57. Based on available information, PLAINTIFF concluded that the marketing materials the Corporation and Herbalife prepared together reflected that the partnership was being used "to drive corporate sales and marketing, not charitable objectives." Corporation personnel described the partnership as "designed to leverage [the Corporation's] network and reputation to promote the

Herbalife brand in Africa." Herbalife paid more than $123 million in 2020 to resolve Foreign Corrupt Practices Act books-and-records and internal-controls charges brought by the USDOJ and the Securities and Exchange Commission over its China operations. Separately, Herbalife paid $200 million in 2016 in consumer redress to settle Federal Trade Commission charges of deceptive earnings claims and an unfair compensation structure that reportedly rewarded recruitment over retail sales. PLAINTIFF disclosed his findings to Congress and the USAID OIG.

58. PLAINTIFF's investigation substantiated all of the anonymous allegations and disclosed further evidence of potential wrongdoing, including credit card fraud, violations of travel rules and regulations, and serious procurement irregularities. Specifically, PLAINTIFF's preliminary findings—the findings he delivered to FELEKE and Board Chairman Leslie on December 1, 2021; reported to the USAID OIG beginning December 2, 2021; and/or delivered to ADKINS on January 28, 2022—included evidence supporting each of the following, each of which PLAINTIFF reasonably believed evidenced a violation of law, rule, or regulation, gross mismanagement, or a gross waste of Corporation funds:

i. the Corporation maintained a hostile and toxic work environment under former P/CEO Glin, involving potential abuse and harassment, which was continuing in nature at the time PLAINTIFF was hired;

ii. Glin had failed to file mandatory public financial disclosure reports for 2018, 2020, and 2021;

iii. Glin had failed to disclose his outside position on the Board of Directors of Root Capital in his public financial disclosure for 2019;

iv. Glin failed to recuse himself from funding decisions with respect to Root Capital despite his position on its Board of Directors;

v. the Corporation had violated the Federal Acquisition Regulation, 48 C.F.R. § 13.301(a), in connection with Glin's use of his Government Purchase Card;

vi. approximately $250,000 had been awarded on a noncompetitive basis to the Association of Ghana Industries under Grant No. 5103-GHA on the condition that the grantee contract with Glin's former employer, Pyxera Global, to conduct a study of the artisan sector in Ghana;

vii. Corporation funds had been directed to non-African and domestic recipients, contrary to the Corporation's statutory mandate to support local enterprises in Africa, 22 U.S.C. § 290h *et seq.*, including but not limited to: (1) Africa 24 (Grant Nos. 5551-MUS and 5552-MUS) wherein grants (instead of contracts) were improperly used to fund two communications contractors at the Corporation's Washington, DC headquarters, and the grants were administered by ZAHUI rather than by Corporation program staff; (2) a strategic partnership under which the Corporation paid Mastercard approximately one million dollars; and (3) cooperative agreement grants of approximately $600,000 to CS Consulting (including Grant No. 5418-KEN) as to which Corporation staff had raised concerns of self-dealing;

viii. the Corporation, at the direction of Glin and others who overruled Corporation program staff, had continued to disburse funds to Vava Coffee under Grant No. 4804-KEN despite evidence of the grantee's mismanagement of funds, in order to avoid the public optics of a disgruntled grantee;

ix. the Corporation's partnership with Herbalife, whose CEO John Agwunobi served as Vice Chairman for the Corporation's Board of Directors, presented a

conflict of interest that PLAINTIFF reasonably believed implicated 18 U.S.C. § 208;

x. ESPartners had been accorded preferential treatment, in deviation from the Corporation's open-competition process, in its selection as the Corporation's partner and Country Program Coordinator for Côte d'Ivoire because its principal, Eric Kacou, was personally known to Glin before the program came to fruition; and

xi. gross mismanagement of Corporation funds during Glin's tenure.

***D. ZAHUI'S OBSTRUCTION OF THE PROCUREMENT REVIEW***

59. On November 19, 2021, PLAINTIFF met with ZAHUI to ensure appropriate legal oversight of Corporation procurement actions. ZAHUI refused to allow the Office of General Counsel to review Corporation procurement actions. ZAHUI asserted that the review of Corporation procurement actions was "not in [PLAINTIFF's] job description," even though it was explicitly included in the position description for the General Counsel. ZAHUI asserted that any such review required authorization from the P/CEO. PLAINTIFF's request did not arise in a vacuum: on November 16, 2021, PLAINTIFF had emailed ZAHUI expressing concern about potential procurement irregularities, and on November 17, 2021, PLAINTIFF forwarded that email to FELEKE, writing: "I am concerned by USADF procurement practices. I need to look into this more, but I might recommend in the near future that OGC review all procurement actions, even if de minimis." A transcript of the November 19, 2021 meeting exists. It records that PLAINTIFF identified specific Corporation procurement actions as "unlawful" and "illegal," and that PLAINTIFF notified ZAHUI of PLAINTIFF's affirmative obligation, as an employee and attorney of the Federal government, to report fraud, waste, and abuse, stating that if the violations were not

resolved he would be required to report them "internally or externally." ZAHUI was thus on express notice, from November 19, 2021 forward, that PLAINTIFF intended to communicate information concerning suspected Federal offenses to the appropriate authorities.

60. FELEKE supported ZAHUI's refusal and denied PLAINTIFF's request to allow appropriate legal oversight of Corporation procurement actions. On December 6, 2021, PLAINTIFF formally requested in writing, from FELEKE and ZAHUI, the Corporation's contract with the Treasury Department's Bureau of Fiscal Service, the Corporation's finance and administration policies and procedures, and a detailed budget. On December 11, 2021, FELEKE responded in writing: "The intent is not to add an additional layer of GC clearance to a process that management already feels is detailed and thorough."

61. As is now established by his guilty plea, at the time ZAHUI refused to permit the Office of General Counsel to review the Corporation's procurement actions, ZAHUI was accepting cash gratuities from a Corporation contractor whose invoices he approved, as alleged in Section N below. ZAHUI's obstruction was undertaken to prevent the discovery of his own crimes. ZAHUI's obstruction extended to the witnesses themselves: on November 29, 2021, ZAHUI sent an email alerting the Corporation supervisor of contractor Elizabeth DeFreest that DeFreest had disclosed unlawful procurement practices to PLAINTIFF during her investigative interview. ZAHUI's email directly caused DeFreest to withdraw from the investigation out of fear for her employment.

### *E. FELEKE'S SUPPRESSION OF THE INVESTIGATION AND PLAINTIFF'S REPORTS TO THE INSPECTOR GENERAL*

62. FELEKE thereafter cut the investigation short, demanding that PLAINTIFF complete his report by December 1, 2021. FELEKE instructed PLAINTIFF to omit from his report the evidence of wrongdoing he had gathered and to confine the report to forward-looking policy recommendations.

63. PLAINTIFF refused to falsify or sanitize his findings. On December 1, 2021, PLAINTIFF delivered his findings to FELEKE and to Board Chairman Leslie.

64. On December 2, 2021, PLAINTIFF was ordered to halt his investigation. A verbatim transcript of FELEKE's December 2, 2021 meeting with PLAINTIFF records that FELEKE conveyed the Board Chairman's position that he was "not interested in continuing further investigation" into any of PLAINTIFF's findings and that he "does not see the need to work with the Office of Government Ethics" concerning former P/CEO Glin's missing financial disclosures, and that FELEKE told PLAINTIFF: "you need to adopt whatever management and organizational culture that we have here."

65. On December 2 and December 4, 2021, PLAINTIFF reported his findings, and the Corporation's suppression of them, to the USAID OIG, which has jurisdiction over USADF. PLAINTIFF thereafter made follow-on submissions to OIG, and was advised of the opening of an investigation. PLAINTIFF's submissions of information and documentation to OIG continued through at least July 2, 2022, the date of his constructive discharge, and transmitted, among other things, evidence supporting each of the findings itemized in Section C above.

66. PLAINTIFF's reports to OIG were lawful disclosures of information PLAINTIFF reasonably believed evidenced violations of law, gross mismanagement, gross waste of funds, abuse of authority, and conduct constituting Federal criminal offenses, made to the officials Congress designated to receive them.

### *F. PLAINTIFF'S ETHICS ENFORCEMENT AGAINST GLIN*

67. In January 2022, PLAINTIFF, acting in his capacity as DAEO, contacted former P/CEO Glin to ask him to file public financial disclosure reports for 2018, 2020, and 2021 and to pay $600 in late-filing penalties to the U.S. Treasury. On January 4, 2022, PLAINTIFF notified

FELEKE and ZAHUI in writing that he had consulted the Office of Government Ethics ("OGE"), and it had directed him to request Glin to file the missing public financial disclosures and pay a monetary penalty of $200 per missing disclosure. On January 5, 2022, FELEKE chastised PLAINTIFF for contacting Glin. PLAINTIFF responded in writing the same day that OGE had confirmed that PLAINTIFF had "exclusive authority and responsibility for communicating with CD Glin regarding his missing public financial disclosures," and he was required "to report to OGE any interference with the performance of my responsibilities as DAEO."

68. Former P/CEO Glin complained about PLAINTIFF's ethics enforcement to incoming P/CEO ADKINS. ADKINS has admitted the relationship under oath: asked at his February 12, 2024 deposition to describe his relationship with Glin, ADKINS answered "A friend," and testified that the friendship began "[m]aybe 20 years ago." Glin informed ADKINS that the conduct of the Corporation's General Counsel—namely, PLAINTIFF's basic request for Glin to file mandatory public financial disclosures for 2018, 2020, and 2021—was "verging on badgering and harassment." On information and belief, Glin never filed the mandatory public financial disclosure reports for 2018, 2020, and 2021, five years after PLAINTIFF first identified the serious violation of the Ethics in Government Act by the former P/CEO. A review of publicly available public financial disclosure reports does not include any filed by Glin in any year.

69. PLAINTIFF's ethics enforcement against Glin included researching publicly available information, including social media, to verify Glin's compliance and current activities. FELEKE later characterized this legitimate ethics research, in a sworn statement to Federal law enforcement, as PLAINTIFF having "conducted extensive research into staff social media accounts, including those frequented by the former CEO of USADF" and having "demonstrated

his ability to access personal and unauthorized information easily to continue manipulating and harassing people"—recasting PLAINTIFF's ethics-enforcement duties as unusual conduct.

### *G. THE SCHEME TO REMOVE PLAINTIFF AND THE JANUARY 21, 2022 SUSPENSION*

70. Beginning no later than January 7, 2022—eleven days before ADKINS was sworn in as P/CEO and at his direction—ZAHUI corresponded with the U.S. Department of Interior's Interior Business Center ("IBC"), the Corporation's outsourced human resources service provider, about removing PLAINTIFF, describing PLAINTIFF as "defying authority" and proposing "a do over" of PLAINTIFF's appointment. ZAHUI's first written contact with IBC on this subject, sent January 7, 2022 at 12:33 p.m.—before ADKINS was sworn in and before ADKINS had ever met PLAINTIFF—stated that the incoming President wished to discuss "a hiring (senior level) done during the interim period that should not have been done, and the incumbent is defying authority," and that "we do have the specifics documented." By January 10, 2022, ZAHUI confirmed to IBC that he had "checked with Travis (incoming President & CEO)" regarding the plan—eight days before ADKINS' swearing-in. On January 11, 2022, ZAHUI identified the "[p]articipants on our side" for a joint call with IBC concerning PLAINTIFF as ADKINS, FELEKE, and ZAHUI—establishing that all three individual DEFENDANTS jointly coordinated with the Corporation's human-resources provider regarding PLAINTIFF's removal before ADKINS assumed office.

71. At his deposition on February 12, 2024, ADKINS testified that he had no communications with IBC before he was sworn in on January 18, 2022, answering "No" when asked directly. He replied "None that I recall" when asked about communications with IBC "with respect to any issues." He stated that he did not recall issuing any instructions or directions to Corporation staff (or engaging in discussions with anyone) concerning particular Corporation employees before he was sworn in. However, he stated "Perhaps" when asked specifically about

discussions concerning PLAINTIFF. Those denials cannot be reconciled with ZAHUI's contemporaneous written record, including ZAHUI's January 10, 2022 email to IBC that he had "checked with Travis (incoming President & CEO)" and ZAHUI's January 11, 2022 identification of ADKINS as a participant on the planned call concerning PLAINTIFF. FELEKE, for her part, conceded at her deposition that the pre-arrival IBC "orientation" would include "staffing and HR challenges," and answered "Correct" when asked whether that included PLAINTIFF. A Defendant's sworn denial of coordination that his co-Defendant's contemporaneous writings document is itself evidence of concealment and of consciousness of the scheme's wrongfulness.

72. By January 20, 2022, ZAHUI wrote to the IBC that ADKINS wanted PLAINTIFF placed on indefinite and involuntary administrative leave "with the intent of removal." ZAHUI's email, sent at 7:22 a.m. that morning, stated that ADKINS "would like to move fast on this one" and "would like to consider all his options," and attached the Corporation's own misconduct policy manual as the basis for "his thinking and options." ZAHUI's email preceded, by hours, ADKINS' dismissive "[a]cknowledging receipt of your concerns" reply that same afternoon to PLAINTIFF's written complaint of retaliation. The day before, on January 19, 2022—one day after ADKINS was sworn in—PLAINTIFF was notified in writing that the Office of General Counsel would, for the first time, be excluded from the Corporation's Senior Leadership Team. Also on January 19, 2022, and again on January 20, 2022, PLAINTIFF wrote directly to ADKINS, describing the ongoing retaliation against him by FELEKE and ZAHUI and requesting a meeting. ADKINS responded on January 20, 2022: "Acknowledging receipt of your concerns. I will take them under review and respond in due course."

73. On January 21, 2022—ADKINS' fourth day in office, before ADKINS had spent a single working day with PLAINTIFF, and eighty-nine days after PLAINTIFF commenced

employment—ADKINS suspended PLAINTIFF, putting him on indefinite and involuntary administrative leave, pending a purported investigation of unspecified allegations of misconduct. In a recorded call, ADKINS declined to state the basis for the suspension and described it as "a first step in an adverse action." The recorded call further establishes that PLAINTIFF asked: "Will I be provided at some point information on the specific allegations that are being made against me and how I can defend myself against those allegations," and that ADKINS responded: "Yes." That promise was never honored. The suspension rested on a 76-page compilation of purported staff complaints assembled by FELEKE and ZAHUI—incorporating the complaint of former P/CEO Glin, whose alleged misconduct was central to PLAINTIFF's investigation—that was delivered to ADKINS on his first day in office and was never provided to PLAINTIFF. That compilation—captioned "Memo on GC DUNNE Conduct"—was shared by ZAHUI with IBC's Melody Jameson on January 19, 2022, two days before the suspension, and was forwarded by Jameson to IBC Employee Relations Specialist Suzanne Becker ("Becker") that same day "for review and action/next steps." The memorandum was consistent with the DEFENDANTS' unprecedented smear campaign against PLAINTIFF. They exhausted the thesaurus to compile a laundry list of bizarre adjectives: "Adversarial, Belittling, Calculating, Combative, Condescending, Deceitful, Defensive, Grimy, Sinister, and Unwholesome." They further described PLAINTIFF as a "danger to USADF's mission and staff" because he had publicly exposed the Corporation's rampant fraud, waste, and abuse. Among the acts catalogued as misconduct in the document was PLAINTIFF's enforcement of Glin's ethics-disclosure obligations—the same lawful conduct described in Section F above.

74. FELEKE has since testified under oath that PLAINTIFF's return to the General Counsel role "was never under consideration."

75. At the time of the suspension, no allegation of misconduct against PLAINTIFF had been identified to PLAINTIFF, and none ever was. (PLAINTIFF only learned of the specific allegations years later through discovery in an administrative proceeding before the Equal Employment Opportunity Commission ("EEOC").) The Corporation's human-resources service provider did not recommend the suspension: Becker, shown the Corporation's written representation that ADKINS acted "per the recommendation of IBC," testified: "No." ADKINS' own memorandum to the USADF Board of Directors states: "After I consulted USADF's Human Resources service provider IBC, it recommended Mr. DUNNE immediately be placed on Administrative Leave for misconduct and performance, which took effect on January 21, 2022"—a claim Becker's sworn testimony directly refutes. Becker testified that suspending PLAINTIFF was "something that Mr. ADKINS wanted to move forward with" and that the decision "was ultimately their decision." On January 21, 2022—the day of the suspension—Chief Information Officer Solomon Chi emailed PLAINTIFF that he had been "informed that [PLAINTIFF] no longer work[ed] at USADF" and requested the return of PLAINTIFF's Corporation-issued equipment.

### *H. THE GAG ORDER, THE EQUIPMENT DEMAND, AND THE EXIT CLEARANCE FORM*

76. On January 26, 2022, ADKINS issued a Corporation-wide memorandum describing employee protections for whistleblowers and applicable prohibited personnel practices. As alleged in Section O below, the USAID OIG later found that memorandum inadequate because it never mentioned USAID OIG. At the same time, ADKINS, along with FELEKE and ZAHUI, were engaged in an unprecedented retaliation and smear campaign against PLAINTIFF, who was a whistleblower himself.

77. On January 28, 2022—the same day PLAINTIFF delivered his internal investigation report to ADKINS and requested a written explanation for the indefinite and involuntary administrative leave along with an opportunity to respond—ADKINS issued a cease-and-desist memorandum, in effect a gag order, threatening PLAINTIFF with disciplinary action if he failed to comply. The memorandum instructed PLAINTIFF not to contact any USADF employee except ADKINS—thereby prohibiting PLAINTIFF from communicating with the very witnesses who had provided information in his investigation and who could corroborate his reports to the USAID OIG.

78. On January 29, 2022, PLAINTIFF sent a written settlement proposal to ADKINS, which was explicitly labeled in the subject line and the email in all caps as "CONFIDENTIAL: FOR SETTLEMENT PURPOSES ONLY UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE." In that email, PLAINTIFF formally and in writing identified ADKINS, FELEKE, and ZAHUI by name as having "retaliated against me (as a whistleblower) for engaging in protected activities" under Federal law.

79. On February 1, 2022, PLAINTIFF sent an email to ADKINS stating that PLAINTIFF was a whistleblower and that the suspension was retaliatory. In that email, PLAINTIFF advised ADKINS of his December 4, 2021 report to USAID OIG, of his follow-on submissions to OIG, of the reported opening of a criminal investigation, and requested a return to duty status. This email placed ADKINS on direct written notice that PLAINTIFF was a cooperating witness in an active Federal investigation involving conduct at the Corporation. ADKINS' response was to maintain PLAINTIFF on indefinite and involuntary administrative leave for five more months. The next day, February 2, 2022, IBC Employee Relations Specialist Becker wrote to ADKINS: "While there is a close proximity in time between the USAID OIG filing by Mr. DUNNE and placement of him

o[n] paid administrative leave, for you to have retaliated against him would mean that you were aware of the OIG filing."

80. On or about February 2, 2022, PLAINTIFF received three boxes and a letter from ZAHUI instructing him to return his computer equipment by February 8, 2022, and explicitly threatening paycheck deductions for non-compliance. The letter was accompanied by an Exit Clearance Form—a document that, in USADF's standard practice, is used exclusively for employees departing the organization, which sent a clear signal that PLAINTIFF was being constructively discharged. This was confirmed when Chief Information Officer Solomon Chi emailed PLAINTIFF that he had been "informed that [PLAINTIFF] no longer work[ed] at USADF" and requested the return of PLAINTIFF's Corporation-issued equipment.

### *I. FELEKE'S FALSE STATEMENT TO FEDERAL LAW ENFORCEMENT AND THE ATTEMPT TO CAUSE PLAINTIFF'S ARREST*

81. On or about February 07, 2022, only days after PLAINTIFF informed ADKINS that PLAINTIFF was a whistleblower, FELEKE delivered to the United States Department of Homeland Security, Federal Protective Service, Investigations Branch, Region 11, a multi-page written statement concerning PLAINTIFF ("Feleke Statement"). The document was prepared on Federal Protective Service letterhead, was marked "FOR OFFICIAL USE ONLY," and was directed to Special Agent William Matos and Inspector R. Chris Wilson.

82. The Feleke Statement was captioned "AFFIDAVIT" and recited that FELEKE was "being duly sworn." The spaces designating the State and County of execution were left blank. The signature line for the affiant was left blank. The jurat was left blank, as were the signature lines for the investigator and the witness, the recitation of the number of pages, and the spaces for FELEKE's initials on each page. FELEKE nonetheless caused the Feleke Statement to be delivered to Federal law enforcement bearing the recitations that she had "read the foregoing

affidavit," that it was "true and accurate to the best of my knowledge and belief," and that she made it "freely and voluntarily." Each of those recitations was false, and FELEKE knew each of them was false when she caused the document to be delivered. The Feleke Statement was not true and accurate to the best of FELEKE's knowledge and belief. Instead, it was a knowing fabrication, delivered to Federal criminal investigators in the trappings of sworn testimony.

83. PLAINTIFF expressly, categorically, and unequivocally denies each and every accusation and insinuation in the Feleke Statement. PLAINTIFF never threatened FELEKE, her family, her children, or any other person, in any manner, at any time. PLAINTIFF never committed, attempted, or contemplated extortion during his employment with USADF. PLAINTIFF never harassed, stalked, surveilled, followed, or menaced FELEKE or anyone else at any time. PLAINTIFF never engaged in any unstable, dangerous, obsessive, or violent conduct of any kind during his employment with USADF. PLAINTIFF never possessed, sought, or used any information concerning FELEKE's residence, her children, her children's schools, or her children's activities at any time. Every statement and every insinuation in the Feleke Statement to the contrary was false when made, and FELEKE knew it was false when she made it, because FELEKE had personal knowledge of the true facts. FELEKE had authorized the very investigation she recast as menace. FELEKE knew that PLAINTIFF's witness interviews were video-recorded and professionally conducted. FELEKE had received the January 29, 2022 communication she recast as an "extortion letter" and knew it to be a confidential attorney settlement proposal expressly labeled under Rule 408, as her own Statement elsewhere concedes in describing it as "his attempt to negotiate a settlement." FELEKE knew that PLAINTIFF's sole text message to her was a screenshot of a former Governor's public statement that "integrity in public service matters," and she had told the FCPD, just days earlier, the materially accurate account—one text, no further

contact, no fear—that refutes the account she gave Federal law enforcement. ADKINS and ZAHUI, who concurred in, encouraged, and participated in the making and delivery of the Feleke Statement, likewise knew that its accusations were false, from the same facts and the same Corporation records. The Feleke Statement was, from its first recitation to its last accusation, a document its authors knew to be false when they placed it in the hands of Federal criminal investigators.

84. In the Feleke Statement, FELEKE made numerous false statements and blatant misrepresentations to Federal law enforcement as part of an unprecedented retaliation and smear campaign against PLAINTIFF, including but not limited to:

i. FELEKE was "writing this statement due to fear for personal safety, as well as anxiety and distress created by Mr. Matthew Dunne's behavior and threats towards me and senior leadership at USADF";

ii. PLAINTIFF's behavior was "abnormal and unprofessional," "increasingly alarming," "unpredictable and obsessive";

iii. PLAINTIFF "began falsifying information to cover his insubordination or abusive behaviors towards staff";

iv. PLAINTIFF's conduct constituted "bullying";

v. PLAINTIFF "was making direct as well as vailed [*sic*] threats";

vi. after being placed on indefinite and involuntary administrative leave, PLAINTIFF "started showing signs of becoming unhinged and unstable";

vii. on January 24, 2022, PLAINTIFF "sent me a text message of a eulogy at a funeral";

viii. PLAINTIFF "sent an extortion letter to USADF where he indicated that in exchange for money, he was willing to dismiss all potential legal actions against the Corporation," and "[h]is attempt to extort a Federal Corporation is yet another example of unstable and potentially dangerous behavior"; and

ix. "[t]he potential escalation may present a clear danger to me and the safety of my family. As such, I have gone as far as warning my own children of the potential threat—an attempt to instill safety precaution as they walk to and from school alone. Mr. DUNNE is familiar with where I live and I believe he has information about my kids [*sic*] extracurricular activities and schools."

85. The Feleke Statement describes the circumstances in which PLAINTIFF learned of the anonymous allegations of egregious corruption and launched an internal investigation, which was authorized by FELEKE. However, FELEKE characterizes PLAINTIFF's efforts to ensure strict compliance with applicable laws and regulations as "abnormal and unprofessional behavior." FELEKE describes "his combative behavior as well as coercive, and intimidation tactics that he was using to interview staff under the guise of collecting information," despite her knowledge that all the interviews were video-recorded and conducted by PLAINTIFF with a friendly and professional demeanor. FELEKE describes "insubordinate or abusive behaviors towards staff at the agency," which refers to PLAINTIFF's refusal to sweep his findings under the carpet and his request to former P/CEO Glin to file missing mandatory public financial disclosure reports for 2018, 2020, and 2021. Through bizarre and extreme characterizations of objective facts, FELEKE, along with ADKINS and ZAHUI, sought to present PLAINTIFF as a dangerous and threatening individual and cause his arrest.

86. The communication that FELEKE characterized as "extortion" was, in fact, a settlement communication transmitted by PLAINTIFF, an attorney, in connection with a contemplated legal claim against his employer. It was explicitly labeled in the subject line and in the email in all caps as "CONFIDENTIAL: FOR SETTLEMENT PURPOSES ONLY UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE." FELEKE's own statement acknowledges as much, elsewhere describing the same communication as "his attempt to negotiate a settlement."

87. The Feleke Statement professes fear so acute that FELEKE had supposedly warned her children about walking to school, yet FELEKE never sought the protective order the police offered her two days earlier, never reported any such fear to the police department actually responsible for her home and her children's schools, and, on information and belief, never reported her purported fears to the Corporation's Board of Directors or any workplace-security authority. The "eulogy at a funeral" text that FELEKE's affidavit and the ADKINS memorandum cited as evidence of a threat was, in fact, a mere screenshot of a public statement by a former New York Governor reflecting on the legacy of Sheldon Silver and concluding "integrity in public service matters," which was appropriate and timely given the DEFENDANTS' unprecedented retaliation and smear campaign against PLAINTIFF.

88. At the time FELEKE made these statements, she knew that PLAINTIFF had never threatened her, had never threatened her family, had never been the subject of any allegation of violence or instability, had no history of any such conduct, had no knowledge of her home address or her children's school(s) and extracurricular activities, and had done nothing other than perform his duties as General Counsel and assert his legal rights.

89. The portrait the Feleke Statement painted was not an exaggeration of a real person. Instead, it was a malicious invention. The man the Statement described—"unhinged and unstable," "obsessive," an extortionist, a maker of "direct as well as vailed [sic] threats," a "clear danger" to a mother and her children—was, in fact, a then-45-year-old attorney and member in good standing of the Bar of the District of Columbia for seventeen years, a Sunday school teacher, a soccer coach of children ages 5 to 16, a volunteer education advocate who campaigned for full funding for public schools and to save high school sports and other programs from elimination by the School Board, a career public servant with no criminal history, no history of violence, and no allegation of violence or instability ever made against him by anyone, whose entire tenure at the Corporation had spanned eighty-nine working days before DEFENDANTS suspended him.

90. FELEKE made these statements to Federal law enforcement not out of any genuine fear for her safety or that of her children, but for the personal purpose of discrediting PLAINTIFF, manufacturing a pretextual justification for the adverse actions already taken against him, deterring him from pursuing his rights and from continuing to provide information to the USAID OIG, and causing his arrest. FELEKE's statements to the Federal Protective Service were made shortly after PLAINTIFF, in his January 29, 2022 written communication, formally identified FELEKE by name as having retaliated against him and several days after ADKINS was notified by PLAINTIFF that he had disclosed his investigation report and its findings of rampant fraud, waste, and abuse to the USAID OIG

91. The Feleke Statement bore every outward form of a criminal referral, and it was calculated to function as one. It was directed not to a human-resources office, a security desk, or the Corporation's own counsel, but to the Investigations Branch of a Federal law enforcement agency. It was prepared on Federal law enforcement letterhead, captioned "AFFIDAVIT," marked

"FOR OFFICIAL USE ONLY," and cast in the recitals of sworn testimony. Its centerpiece accusations were accusations of crime: that PLAINTIFF had "sent an extortion letter" to a Federal corporation (a felony under Federal law) and that he posed a "clear danger" to FELEKE and to her children as they "walk to and from school alone."

### *J. FELEKE'S CONTEMPORANEOUS REPORT TO THE FAIRFAX COUNTY POLICE ESTABLISHES THE FALSITY OF HER REPORT TO FEDERAL LAW ENFORCEMENT*

92. Before she delivered her statement to the Federal Protective Service, FELEKE made a report concerning PLAINTIFF to the FCPD, Report No. 20220280172 ("FCPD Report").

93. The FCPD Report records that the report was received by telephone on Friday, January 28, 2022 at 17:21 hours, and was taken by Officer Angelo J. Leto and approved by Officer Imran Farooq. It identifies FELEKE as complainant and PLAINTIFF as the subject. The FCPD Report classifies the matter under two offense categories: "SERVICE—POLICE SERVICE" and "SERVICE—POLICE PHONE REPORT," each bearing IBR Code 9999. The fields for "Criminal Activity" and "Weapons" are blank. No criminal offense of any kind was recorded.

94. The narrative of the FCPD Report, prepared by the reporting officer on the day of the call, states that PLAINTIFF had texted FELEKE a single time, the text—a mere screenshot of a January 24, 2022 Twitter post by former New York Governor George Pataki reflecting on the legacy of Sheldon Silver and concluding "integrity in public service matters"—was about "how she has no integrity," that he had not contacted her since, and that she did not feel threatened by him.

95. The FCPD Report and the Feleke Statement are irreconcilable. Within days, FELEKE told FCPD and FPS materially different things:

i. FELEKE told FCPD that she did not feel threatened, but she told FPS about her "fear for personal safety" and falsely alleged that PLAINTIFF had made "threats to me and senior leadership at USADF";

ii. FELEKE did not mention anything about her children or her family to FCPD, but she told FPS that she was "fearful and concerned for my and my family's safety" and falsely alleged that PLAINTIFF "is familiar with where I live" and "has information about my kids extracurricular activities and schools";

iii. FELEKE falsely told FPS that PLAINTIFF was "showing signs of becoming unhinged and unstable" and was engaged in "unstable and potentially dangerous behavior," but she did not make similar allegations to FCPD;

iv. FELEKE falsely told FPS that PLAINTIFF "continued to harass staff," but she told FCPD that he had texted her a single time about "how she has no integrity."

96. Portions of the Feleke Statement were not merely false but impossible, and DEFENDANTS' own records prove the impossibility. For example, the Feleke Statement's recitation that "[l]ocal authorities advised that I and my family remain vigilant and take all necessary security measures" described advice that the local authorities' own report shows was never given. The FCPD Report reflects that FELEKE told the officer she did not feel threatened, declined the protective measures offered, and that no further action was recommended or taken. FELEKE did not merely mischaracterize events to Federal law enforcement—she invented statements by another law enforcement agency and attributed them to it.

97. Although FCPD explained how to obtain an emergency protective order, FELEKE never sought one, and none was ever issued. No criminal charge was ever brought against

PLAINTIFF arising out of these or similar events. The National Crime Information Center check returned negative results, and FCPD took "[n]o further actions."

98. FCPD Report demonstrates that FELEKE's statements to the Federal Protective Service were not the product of genuine fear, mistaken perception, or exaggeration under stress. FELEKE had, days earlier, given a different account of the same facts to a police officer, had been offered the protection available to a person genuinely in fear, and had declined it. Her subsequent escalation of the same facts—for a Federal audience, in a document invoking her children, only days after Plaintiff's disclosure of his whistleblowing to the USAID OIG – was deliberate and plainly calculated and designed to cause PLAINTIFF's arrest.

99. PLAINTIFF did not obtain and could not reasonably have obtained the FCPD Report at or near the time of the events described. The FCPD Report was released to

100. PLAINTIFF on or about February 12, 2026. Until that date, PLAINTIFF was unaware of the existence of the FCPD Report, of FELEKE's statement to the reporting officer that she did not feel threatened, and therefore of the obvious contradictions with the Feleke Statement.

101. DEFENDANTS concealed the content of the Feleke Statement and its falsity from PLAINTIFF, and PLAINTIFF exercised reasonable diligence in the investigation of his claims. PLAINTIFF first learned of the existence of the Feleke Statement through discovery in an administrative proceeding before the EEOC due to its inclusion on the Corporation's Privilege Log included with *Agency's Supplemental Response to Complainant's Discovery Requests* in EEOC No. 570-2023-00446X (Agency No. USADF-001-2022). However, PLAINTIFF did not receive a copy of the Feleke Statement it was provided by a third party (Sean O'Donnell of Judicial Watch) on January 30, 2026. PLAINTIFF did not learn, and could not with reasonable diligence have

learned, of the falsity of the statements in the Feleke Statement until he received a copy of the Feleke Statement on January 30, 2026.

### *K. THE BOARD MEMORANDUM AND THE SHAM INVESTIGATION*

102. On or after January 31, 2022, ADKINS sent an "Information Memorandum" to Board Chairman Leslie concerning PLAINTIFF's "efforts to damage the reputation of USADF via the Office of the Inspector General." In that same memorandum, ADKINS wrote that PLAINTIFF had conducted an "unauthorized, backward-focused investigation that unsettled staff" and had begun "leveling accusations that USADF senior leadership was 'interfering' with his investigations and General Counsel functions."

103. In that same memorandum, ADKINS informed Board Chairman Leslie of the Corporation's scheme to conduct a "harassment investigation" of PLAINTIFF to "prepare for" a likely Equal Employment Opportunity ("EEO") claim by PLAINTIFF "and then conduct the EEO investigation if DUNNE files a case against the agency."

104. ZAHUI, who served as the nominal complainant in the ensuing investigation, was asked under oath in his deposition whether the statements in that paragraph of ADKINS' memorandum to the USADF Board of Directors were inaccurate or untrue. ZAHUI testified: "From what I can remember, not—none is untrue."

105. In February 2022—immediately after PLAINTIFF initiated the EEO complaint process—the Corporation commissioned a third-party EEO investigation of PLAINTIFF through the United States Postal Service's ("USPS") National EEO Investigative Services Office, case number USADF-22-HCI-001. On February 3, 2022, ZAHUI met with representatives of the USPS for purposes of conducting an EEO investigation against PLAINTIFF. The Corporation's human-resources provider disclaimed the investigation as well: IBC Employee Relations Specialist Becker

testified that the third-party investigation "wasn't our recommendation." She stated that "we were just requested to provide information, and we did." As with the suspension, the investigation originated with DEFENDANTS, not with any independent recommendation by IBC.

106. On information and belief, the investigation was initiated by ZAHUI, as directed by ADKINS and in collaboration with FELEKE. The investigation purported to examine whether PLAINTIFF had subjected Corporation employees to workplace harassment. The investigation identified five vague allegations, all with "unspecified dates to be determined." By explicit Corporation request, the investigator was instructed not to interview PLAINTIFF—the very person accused of misconduct. The investigator's own June 2022 email and July 2022 report confirm that PLAINTIFF, the alleged harasser, was never interviewed "per Corporation request."

***L. THE DENIAL OF DUE PROCESS***

107. Between February and June 2022, PLAINTIFF sent at least eight written "Request for Due Process" communications to the Corporation, requesting identification of the allegations against him, access to the evidence, the status of the investigation, and an opportunity to respond. None was answered. PLAINTIFF's written requests were sent on February 5, February 10, February 14, and February 21, 2022; March 21, 2022; April 20, 2022; May 24, 2022; and June 9, 2022. Meanwhile, ADKINS extended the suspension by memoranda dated February 25, 2022; on or about April 10, 2022; and June 1, 2022. In total, ADKINS maintained PLAINTIFF on indefinite and involuntary administrative leave for approximately 162 days. IBC Employee Relations Specialist Becker testified that in her experience she was aware of no other instance of a Federal employee being maintained on indefinite and involuntary administrative leave for 162 days, and that IBC did not recommend the original suspension or any of the extensions.

108. On information and belief, the Corporation failed to make the report to Congress required by 5 U.S.C. § 6329b after PLAINTIFF's investigative leave exceeded ninety days, even though PLAINTIFF notified ADKINS of the Corporation's statutory obligations to submit a report to Congress.

### *M. PLAINTIFF'S CONSTRUCTIVE DISCHARGE AND THE SCHEME AGAINST PLAINTIFF'S SUBSEQUENT EMPLOYMENT*

109. The retaliation and smear campaign by ADKINS, FELEKE, and ZAHUI—along with the denial of any due process and the denial of any opportunity to return to duty status (which FELEKE confirmed, under oath, was never considered)—led to the constructive discharge of PLAINTIFF. PLAINTIFF was in an untenable position on indefinite and involuntary leave, and as the primary breadwinner for his family, he risked being unable to provide for them in the event he was terminated. Accordingly, PLAINTIFF was forced to consider alternate employment, even though such options, after less than a year at USADF, would likely derail his career advancement.

110. On June 6, 2022, PLAINTIFF received an offer for a position as a GS-15 Trial Attorney with the Federal Energy Regulatory Commission ("FERC"). PLAINTIFF had expected to start at FERC as soon as June 19, 2022, but ultimately scheduled a start date of July 3, 2022. Upon learning of the new start date, ADKINS notified IBC on June 15, 2022 of his intention to sabotage PLAINTIFF's employment with FERC:

> I would prefer that a message notifying FERC of Mr. DUNNE's attitude, behavior, and dishonesty in this process comes from IBC and makes clear that he is the sole source of any confusion. If the IBC will not take up that function on our behalf—USADF will have to take the matter into its own hands. We do intend for FERC to be made aware of Mr. DUNNE's conduct in this matter.

111. ADKINS' scheme to transmit derogatory and false information about PLAINTIFF to his prospective employer served no purpose of the Corporation whatsoever. It was undertaken for the personal purpose of injuring PLAINTIFF. On information and belief, ADKINS, personally or through IBC or other persons acting at his direction, thereafter caused derogatory and false information concerning PLAINTIFF to be communicated to FERC, which injured PLAINTIFF's standing, advancement, and continued employment at FERC.

112. On information and belief, DEFENDANTS received the draft report for their EEO investigation against PLAINTIFF during this period, but refused to review and approve the report. In the end, USPS closed the investigation on its own initiative and sent the final USPS report to USADF. As expected, the report was one-sided because DEFENDANTS had instructed the investigator to not interview PLAINTIFF. Moreover, one or more witnesses (such as Mbayu) had refused to provide signed affidavits for what was plainly a retaliatory investigation. By refusing to approve a final report, DEFENDANTS continued to deny any due process to PLAINTIFF and any opportunity for him to return to duty status. (If the report had been finalized, then DEFENDANTS might have been forced to provide PLAINTIFF with the opportunity to respond and return to duty status.)

113. On July 2, 2022, PLAINTIFF was constructively discharged from the Corporation. PLAINTIFF commenced his position with FERC on July 3, 2022. DEFENDANTS' failure to identify allegations, to provide access to evidence, to advise on the status of the investigation, or to provide any due process—confirmed by FELEKE's testimony that PLAINTIFF's return "was never under consideration"—made continued employment impossible and intolerable.

114. On July 15, 2023, unaware that ADKINS had conspired with FELEKE and others to interfere with his employment at FERC, PLAINTIFF departed FERC. PLAINTIFF submitted hundreds of unsuccessful applications for employment in the next several months.

115. The Corporation's removal of PLAINTIFF left it operating without any Federal-employee attorney for 384 days following the resignation of Mbayu, effective April 1, 2022, until Kerline Perry onboarded on April 20, 2023. On information and belief, no Federal agency or Government corporation has allowed its Office of General Counsel to be without a single Federal-employee attorney for any length of time, let alone more than a year. Without Federal-employee attorneys, there was no one with the authority to perform inherently governmental legal functions, including personnel, contracting, ethics, and FOIA matters. The Corporation then engaged Mbayu and a former contractor as *contractors*—the precise arrangement Mbayu had warned in writing was "inherently limited by law." That DEFENDANTS were willing to inflict this operational damage on the Corporation rather than return PLAINTIFF to duty is itself compelling evidence that their objective was personal reprisal and to conceal rampant fraud, waste, and abuse rather than any legitimate Corporation purpose.

***N. ZAHUI'S CRIMES***

116. Between at least August 2019 and August 2022, while the contracts described below were pending, ZAHUI personally and directly received and accepted $12,000 in cash payments—transmitted to his bank account in eight separate payments—from a contractor doing business with the Corporation, because of official acts ZAHUI performed and would perform to benefit the contractor and his company, including ensuring that the company continued to secure contracts with the Corporation, directing Corporation funds to the company through pass-through invoices, and approving the company's invoices. On information and belief, Virginia-based Ganiam LLC

and Kenya-based Ganiam Ltd. (collectively, "Ganiam"), which is owned by ZAHUI's longtime friend Maina Gakure ("Gakure") received approximately $800,000 in Corporation contracts and payments, substantially without competitive bidding. As ZAHUI has stipulated under penalty of perjury, Ganiam received an initial sole-source contract, signed March 5, 2020, in the amount of $173,640, though, as ZAHUI knew, the Corporation was not supposed to award sole-source contracts valued at greater than $100,000. The contract was thereafter extended and increased, at ZAHUI's direction, to $347,280. Two additional sole-source contracts of $350,544 and $93,200 were awarded to Ganiam in 2021 and 2023 under ZAHUI's oversight. In addition, the Corporation paid Ganiam at least $617,625.49 through more than 20 pass-through invoices, along with approximately $214,873.83 through other invoices ZAHUI approved.

117. As ZAHUI has stipulated, between at least June 2020 and December 2023, ZAHUI approved the payment of Corporation funds to Ganiam despite the fact that it performed little to no actual work. ZAHUI arranged for the Corporation to pay its vendors and contractors through Ganiam rather than directly. ZAHUI approved Ganiam's invoices bearing mark-ups ranging from 17% to 66%, even when it did no work justifying the mark-up. ZAHUI permitted Ganiam to collect $134,886.34 in mark-ups out of at least $617,625.49 the Corporation paid on more than 20 pass-through invoices. In one stipulated example, when the Corporation owed a substantial past-due debt to a staffing vendor for IT support services, ZAHUI directed the vendor to invoice Ganiam rather than the Corporation. In August 2020, the vendor invoiced Ganiam $120,000, and Ganiam—which had played no role whatsoever in the vendor's services—in turn invoiced the Corporation $140,653.08 for purported "IT Support for logistical assistance." ZAHUI approved the invoice, yielding the company a mark-up of more than $20,000 for doing nothing. ZAHUI was careful to conceal the scheme from the U.S. Treasury Department's Bureau of Fiscal Service, the

Corporation's outsourced procurement and payment services provider. With ZAHUI's involvement, Ganiam's invoices falsely recited that it had provided "logistical support." When a vendor's invoice description threatened to reveal the truth, ZAHUI had the vendor change the description to falsely reflect logistical services. ZAHUI confirmed to Ganiam in an August 6, 2020 message that the invoices "will be changing" and that a revised invoice would issue the next day, as it did. In another stipulated example, in late 2020, ZAHUI routed a $50,000 membership fee the Corporation owed to a professional networking organization through Ganiam as a pass-through, on an invoice claiming "logistical assistance support" and bearing a mark-up of $9,900.08. ZAHUI did not disclose the conduct, or the cash he received, to the Bureau of Fiscal Service.

118. As a direct result of PLAINTIFF's whistleblowing to Congress and the USAID OIG about procurement irregularities and other corruption, USAID OIG agents interviewed ZAHUI on January 11, 2024. The agents told ZAHUI that it was a crime to lie during the interview. ZAHUI nonetheless knowingly and willfully gave the false response that he had never received any benefits from Ganiam, ZAHUI falsely minimized their relationship. In a second interview on February 1, 2024, ZAHUI lied to the agents again. The full extent of ZAHUI's lies (and his close personal relationship with Gakure) was uncovered only after USAID OIG agents conducted extensive reviews of his phone records, emails, and Corporation records.

119. On January 30, 2026, the United States charged ZAHUI by a two-count criminal information in *United States v. Zahui*, No. 26-cr-16 (JEB) (D.D.C.), with receiving a gratuity as a public official in violation of 18 U.S.C. § 201(c)(1)(B) and with making false statements to Federal law enforcement in violation of 18 U.S.C. § 1001. ZAHUI waived indictment. On February 23, 2026, ZAHUI pled guilty to both counts and executed, under penalty of perjury, a Statement of Offense stipulating to the facts described in this Section. The judgment of conviction adjudicates

the gratuity offense as having continued through April 30, 2023, and the false-statement offense through January 11, 2024.

120. ZAHUI's crimes coincide with the period during which DEFENDANTS obstructed PLAINTIFF's procurement review, suppressed PLAINTIFF's investigation report, and removed PLAINTIFF from Federal service. ZAHUI stipulated that he received training on the duties of a Contracting Officer Representative, and he acknowledged his obligations in writing by signing letters of appointment. ZAHUI was aware of his obligation to avoid conflicts of interest with contractors, and he knew to immediately inform the Contracting Officer or the Office of General Counsel if he ever developed a direct or indirect financial interest that could create a conflict of interest involving a contractor. ZAHUI never reported any potential conflicts of interest to PLAINTIFF during his employment at USADF, where he served as the General Counsel and DAEO. ZAHUI never reported any potential conflicts of interest to anyone else. Instead, on November 19, 2021—while the contractor's pass-through invoices were flowing and the contractor's cash was arriving in his bank account—ZAHUI refused to allow the Office of General Counsel to provide appropriate legal oversight of Corporation procurement actions.

121. ZAHUI directed Gakure to wire $17,000 to ADKINS' executive assistant Jasmine Battle ("Battle") from an overseas account, using the same mechanism ZAHUI used to conceal payments to himself. (Battle later reported and provided evidence of the unlawful payment to Congress and the USAID OIG.) When notified of the payment, ADKINS responded to ZAHUI in writing: "Thanks for this Mathieu—let us know what needs to be done next to fully resolve this matter." ADKINS' written acknowledgment of, and participation in, an unlawful payment to his direct subordinate routed through the same overseas conduit ZAHUI used to receive kickbacks is direct evidence that ADKINS' interest in obstructing PLAINTIFF's procurement oversight and in

retaliating against PLAINTIFF for reporting it was personal and financial, and not institutional. The government's sentencing memorandum corroborates this mechanism. It reports that when Federal agents asked ZAHUI whether he had worked with the contractor to make payments to U.S.-based Corporation employees, ZAHUI denied it. However, the evidence later revealed numerous instances in which ZAHUI directed the contractor's company to submit invoices to the Corporation for the purpose of paying certain U.S.-based Corporation employees, while Ganiam retained mark-ups for doing nothing. These facts came to light only after the USAID OIG agents conducted extensive email and invoice reviews and cross-referenced Corporation records.

### *O. CONGRESSIONAL, INSPECTOR GENERAL, AND GOVERNMENT ACCOUNTABILITY OFFICE VINDICATION OF PLAINTIFF'S REPORTS*

122. On November 1, 2023, as a result of whistleblower complaints from PLAINTIFF and others, Senator James Risch, Ranking Member of the Senate Foreign Relations Committee, wrote to the USAID OIG ("Risch Letter") and requested an investigation of the rampant fraud, waste, and abuse reported by PLAINTIFF and concealed by DEFENDANTS. The Risch Letter identified ADKINS, FELEKE, and ZAHUI by name as officials who "are aware of, and may be complicit in, corrupt and potentially unlawful practices." The Risch Letter publicly identified the Corporation's failure to maintain "a full-time senior legal team responsible for compliance and oversight." The Risch Letter stated that its allegations were based on interviews with "multiple whistleblowers of various ranks and positions at USADF, all of whom have presented direct, first-hand knowledge of alleged impropriety," backed by "bank records, wire transfer records, and copies of text and email communications" received by the Committee. Without naming PLAINTIFF, the Risch Letter independently credited PLAINTIFF's investigation of the Corporation's egregious corruption. The Risch Letter accurately described the suppression of the PLAINTIFF's investigation, his ejection from the Senior Leadership Team, and his suspension

"for a period of six months, in violation of their due process rights" upon the swearing-in of the new P/CEO. The Risch Letter further reported that ZAHUI had been dispatched to multiple countries in Africa to close bank accounts and take possession of records that might "negatively reflect upon" the Corporation. As a direct consequence of these disclosures, Senator Risch placed holds on congressional notifications for Corporation funding and on proposed interagency transfers to the Corporation, pending completion of the USAID OIG investigation.

123. By Management Advisory dated August 29, 2024, the USAID OIG formally advised ADKINS that USADF officials knew of the suspected misuse of Corporation funds and equipment and that they had failed to report it to the USAID OIG as required by law and the Corporation's policies and procedures. The USAID OIG specifically identified ADKINS' January 26, 2022 whistleblower memorandum—which was issued only 5 days after DEFENDANTS suspended PLAINTIFF—as inadequate because it never mentioned USAID OIG. The USAID OIG further noted that a May 2019 memorandum from USADF's own Office of General Counsel had flagged the absence of an OIG link on the Corporation's website and recommended adding it, and that the link was still absent five years later.

124. On August 28, 2025, the USAID OIG published an evaluation captioned *U.S. African Development Foundation: Gaps in Policy and Guidance Hindered Strategic Partnerships and Grants Administration*, Report No. E-ADF-25-004-M. The USAID OIG initiated the evaluation in response to a congressional request that it examine, in part, the Corporation's use of strategic partnerships, which was one of the subjects of the investigation Senator Risch had requested on November 1, 2023 on the basis of PLAINTIFF's disclosures. The USAID OIG found as follows: (a) the Corporation lacked policies and procedures for managing its strategic partnerships, "leading to gaps in due diligence and assessment"; (b) the Corporation drafted a strategic-partnership policy

in May 2022—months after it had suspended and silenced the General Counsel (PLAINTIFF) who reported the absence of such controls—but never finalized it; (c) the Corporation was unable to fully account for its partnerships, such that the documentation for its 32 identified partnerships was incomplete "and there may have been more"; (d) although the Corporation publicly reported an expectation of more than $87 million in cumulative leveraged partnership funds by the end of fiscal year 2023, the Corporation received only $17 million from its partners between fiscal years 2022 and 2024; (e) the Corporation's public reporting on partner funding "did not use clear and consistent terms," which "could mislead readers"; and (f) the Corporation lacked clear guidance and procedures for grants management and administration, resulting in delayed grant activities, inconsistent implementation, and incomplete documentation. These are some of the deficiencies PLAINTIFF identified and reported in November and December 2021: partnerships formed without due diligence, policy, or open competition; public claims of leveraged partnership funding that outran reality; and grants administered outside the Corporation's own rules.

125. On September 15, 2025, the GAO issued a Report to Congressional Requesters captioned *U.S. African Development Foundation: Strategic Approach Needed to Mitigate Fraud Risks*, GAO-25-107574 (the "GAO Report"), addressed to Senator Risch as Chairman of the Committee on Foreign Relations and to Senators Christopher A. Coons and Tim Scott.

126. GAO conducted the performance audit that produced the GAO Report from May 2024 to September 2025 in accordance with generally accepted government auditing standards. GAO's review covered USADF's activities from fiscal year 2020 through fiscal year 2024, a period that encompasses ZAHUI's crimes, PLAINTIFF's employment, his internal investigation, his suspension, and his constructive discharge. GAO stated that it undertook the review because

USADF "has faced allegations of fraud, waste, and abuse originating from former staff" and that the USAID OIG "has an ongoing investigation into USADF."

127. GAO's findings concerning the deliberate under-resourcing of USADF's legal, audit, and compliance functions corroborate PLAINTIFF's allegations concerning the Office of General Counsel and the denial of resources to his investigation. GAO recommended, among other things, that USADF conduct workforce planning assessments to ensure it has the personnel necessary to establish internal control policies, assess and mitigate fraud, ensure appropriate separation of duties, and manage procurements; and that USADF establish a strategic approach to managing fraud risks consistent with leading practices.

128. By memorandum dated August 21, 2025, USADF concurred in all four of GAO's recommendations, stating: "USADF recognizes that without systematic implementation of leading practices, the agency remains vulnerable to fraud, waste, and abuse." In that response, USADF committed, among other things, to conduct "the first agency-wide fraud risk assessment." In this manner, DEFENDANTS acknowledged that they never acted on the voluminous evidence of fraud, waste, and abuse compiled by PLAINTIFF and tacitly condoned the rampant fraud, waste, and abuse.

129. PLAINTIFF's 2021-2022 findings have thus been confirmed, category by category, by the USDOJ (through ZAHUI's conviction), by the USAID OIG (through the August 29, 2024 Management Advisory, the August 28, 2025 evaluation of the Corporation's strategic partnerships and grants administration, the May 29, 2026 Management Advisory on the Corporation's obstruction of oversight, and the USAID OIG's ongoing investigation), by the GAO (through the GAO Report), and by the United States Senate (through the November 1, 2023 letter and subsequent oversight).

130. On October 29, 2024, the USAID OIG executed a search warrant in connection with its investigation of the Corporation. The search warrant reflected evidence that grant recipients had secretly wired money to the personal accounts of Corporation officials at the same time the Corporation was disbursing grants to those same recipients, evidencing a scheme not limited to ZAHUI alone. According to the Corporation's own 2022–2023 financial statement, the Corporation reported $9.7 million in funds "held outside treasury"—corroborating the pattern of concealed, offshore fund-holding described in Senator Risch's November 2023 letter.

131. On January 29, 2026, in a status conference in *Judicial Watch, Inc. v. United States African Development Foundation*, No. 1:25-cv-02623 (D.D.C.), the USDOJ publicly confirmed an ongoing criminal investigation into the Corporation, beyond the charges to which ZAHUI had already agreed to plead guilty. That announcement followed years of cooperation with law enforcement by PLAINTIFF and by ADKINS' former executive assistant Battle, who was likewise terminated after raising concerns about misconduct at the Corporation.

132. On January 30, 2026—the same day the USDOJ announced ZAHUI's agreement to plead guilty—Acting Board Chairman Peter Marocco publicly stated that ZAHUI had pled "guilty to 2 felonies for kickbacks," had "[h]ired firms to attack whistleblowers," and had "[s]ent money to non-existent offices." Marocco further stated that the USDOJ and USAID OIG investigations remained "open" with "much more to come." Whatever one's view of Marocco or the effort he led, his admissions are striking. Eleven months into his tenure as Acting Board Chairman, he described what his continuing examination of Corporation records was uncovering: "the more we dig, we find evidence of intimidating whistleblowers." An acknowledgment from the Corporation's acting leadership that whistleblowers had been attacked with hired firms and that Corporation funds had been sent to offices that did not exist is confirmation of what the USDOJ,

the USAID OIG, and the GAO had independently found: that the egregious corruption PLAINTIFF had reported, and the unprecedented retaliation and smear campaign against those who reported it, were real.

133. Members of Congress have independently concluded, based on their own investigation and review, that the corruption PLAINTIFF exposed extends beyond ZAHUI and warrants further prosecution. On March 10, 2026, seven Members of the Senate and House wrote to the USDOJ ("Lee Letter") that "the institutional corruption runs far deeper than one official," referring to ZAHUI. The Lee Letter called for the USDOJ to continue its investigation into USADF because "[o]ther senior officials, contractors, and grantees have been exposed by credible whistleblower testimonies and evidence." The Lee Letter identified a panoply of crimes by USADF officials, to include "bribery, kickbacks, misuse of funds, steering contracts to African organizations in which senior officials have a financial stake, illicit bookkeeping, pass-throughs from African organizations to DC staff, gross mismanagement, destruction of documents, lack of transparency and oversight, and whistleblower retaliation."

134. On April 20, 2026, Congresswoman Anna Paulina Luna, a Member of the House Committee on Oversight and Government Reform, wrote to the USDOJ ("Luna Letter") that "[c]redible information indicates that, over several years, senior officials, including former President Travis Adkins and finance official Mathieu Zahui, engaged in misconduct including steering contracts to associates, bypassing procurement safeguards, and misusing agency funds." The Luna Letter stated that "[c]redible information also indicates that Mr. Adkins sought to conceal this mismanagement from the agency's board." The Luna Letter urged "a review of the current prosecution, consideration of additional charges where warranted, examination of any

other involved parties, and protection for whistleblowers." PLAINTIFF pleads these statements as public statements made by the identified officials, whose making is a matter of public record.

135. On May 27, 2026, ZAHUI was sentenced by Chief Judge James E. Boasberg of the United States District Court for the District of Columbia to four months' imprisonment and twelve months of supervised release, and ordered to forfeit $12,000, notwithstanding the government's request for a 21-month sentence.

136. Only two days after ZAHUI's sentencing on May 29, 2026, the USAID OIG issued a Management Advisory, Report No. A-ADF-26-005-A, captioned *U.S. African Development Foundation's Lack of Responsiveness to Oversight Matters Limits Transparency Into Corporation Operations and Management of Funds*. The USAID OIG reported that between March 2025 and May 2026, the Corporation was nonresponsive to its information requests for two statutorily mandated assessments, the audit of the Corporation's financial statements and the assessment of its information-security program. The USAID OIG further reported that Corporation leadership did not provide the information required to complete the fiscal year 2025 assessments. The USAID OIG further reported that the Corporation had failed to address eleven of the USAID OIG's twelve open recommendations, some dating to August 2024, "related to addressing fraud risks in the Corporation's grants management activities." The USAID OIG concluded that the lack of timely information from the Corporation "obstructs OIG's oversight" and exposes taxpayer dollars and sensitive government information to "significant and ongoing risks." The period of nonresponsiveness the USAID OIG identified began within weeks of the February 10, 2025 creation of the three-member leadership committee on which ZAHUI and FELEKE served, and continued through ZAHUI's resignation in February 2026.

## *P. THE MARCH 14, 2025 PRESS RELEASE*

137. On March 14, 2025, USADF published on its official website at www.usadf.gov, under a Washington, DC dateline and under the title "USADF Responds to Misguided Legislation Introduced by Senators Risch and Cruz," a press release addressing pending legislation to dissolve the Corporation. The press release was published in the institutional voice of a United States Government agency, without individual byline, on a United States Government domain, and remained publicly accessible on that domain thereafter.

138. At the time of publication, ADKINS had resigned from the Corporation effective February 10, 2025. On or about February 10, 2025, immediately upon ADKINS' resignation, the Board of Directors created, by official Board resolution, a three-member leadership committee—FELEKE, ZAHUI, and General Counsel Kerline Perry—to perform the functions of the P/CEO. At the time the press release was published on March 14, 2025, ZAHUI and FELEKE thus constituted two of the three officials in whom the Corporation's executive functions were vested. The press release could not have been published without the instruction, knowledge, and consent of FELEKE and ZAHUI.

139. In publishing it, ZAHUI and FELEKE—on information and belief, in collaboration with ADKINS, who was no longer employed by the Corporation—appropriated the Corporation's institutional voice for personal ends. On information and belief, DEFENDANTS caused the press release to issue without authorization from the Board of Directors and contrary to the Corporation's own records, which established the falsity of its central assertions. The Corporation itself had no basis for, and no institutional interest in, the statement. Its official form was not evidence of an official purpose but an instrument of the deception, lending the imprimatur of the United States to falsehoods that served only DEFENDANTS' personal interests.

140. Under the heading "False Allegations and Misinformation," the press release stated:

> Senators Risch and Cruz's claims of fraud, waste, and abuse are based on misleading and unreliable sources. The agency itself reported most of these allegations to the Office of the Inspector General (OIG) well before Senator Risch raised them. The primary source of these allegations is a disgruntled former employee who has been under OIG investigation since 2021. These claims have been distorted and misrepresented by those seeking to dismantle an agency that has demonstrated extraordinary success in advancing U.S. interests abroad.

141. Under the adjacent heading "Unwavering Commitment to Accountability and Transparency," the same press release stated:

> USADF has always welcomed oversight and has cooperated fully with the Inspector General's investigation. The agency is audited annually under OIG supervision, and for more than a decade, these audits have found no evidence of fraud or misuse of funds.

142. Each of the foregoing statements was false, and DEFENDANTS knew each to be false when it was published. PLAINTIFF was not, and never had been, the subject of an investigation by the USAID OIG. PLAINTIFF was the *source* of the referral to the USAID OIG, not its target. PLAINTIFF was not a "disgruntled former employee"; instead, as the Corporation's General Counsel, he reported egregious corruption through the channels Congress established for that purpose. His reports have since been substantiated by the USDOJ, the USAID OIG, the GAO, and the U.S. Senate. The assertion that "[t]he agency itself reported most of these allegations to the Office of the Inspector General" was demonstrably false. In fact, the USAID OIG formally

advised ADKINS, in the August 29, 2024 Management Advisory, that USADF officials knew of suspected misuse of Corporation funds and equipment and had failed to report it as required. The assertion that the Corporation's annual audits had "for more than a decade . . . found no evidence of fraud or misuse of funds" was published by, among others, ZAHUI—who at that moment had been accepting cash payments from a Corporation contractor from June 2020 through December 2023, who had approved that contractor's invoices, and who had lied to Federal investigators about those payments in 2024. ZAHUI knew the statement was false because DEFENDANTS were concealing the rampant fraud that the audits had not found.

143. PLAINTIFF was readily and reasonably identifiable to the audience for the press release as the "disgruntled former employee" to whom it referred. The press release responded to legislation introduced by Senators Risch and Cruz. Senator Risch had written to the USAID OIG on November 1, 2023 requesting an investigation of rampant fraud, waste, and abuse reported by PLAINTIFF. PLAINTIFF was the Corporation's former General Counsel, the author of the suppressed internal investigation report, and the person who had made the referral to Congress and the USAID OIG. To every member of the audience with knowledge of those facts—including Members of Congress, congressional staff, USAID OIG personnel, journalists, and others—the reference was plainly to PLAINTIFF and to no one else.

144. The statement that PLAINTIFF had been "under OIG investigation since 2021" charged PLAINTIFF, a member of the Bar of the District of Columbia since 2005 and an elected member of the Fairfax County School Board, with four years of unresolved Federal investigative scrutiny. It was published on a United States Government website, where it carried the apparent imprimatur of the United States and was reasonably understood by readers to reflect the Corporation's official knowledge of its own records.

145. PLAINTIFF neither knew nor, in the exercise of reasonable diligence, could have known of the March 14, 2025 press release or its contents before July 29, 2025 at the earliest. On information and belief, the entire USADF website was taken down in April 2025 at the direction of Acting Board Chairman Marocco. On July 1, 2025, Judge Richard Leon of the U.S. District Court for the District of Columbia granted in part and denied in part the plaintiffs' Motion for Preliminary Injunction in *Rural Development Innovations Ltd. et al. v. Marocco et al.*, No. 1:2025cv01631 (D.D.C. 2026), which led to the eventual restoration of the USADF website. On or about July 29, 2025, the entire USADF website was restored, a fact that PLAINTIFF learned only on July 29, 2025. After July 29, 2025, PLAINTIFF learned about the March 14, 2025 press release from a third party (Sean O'Donnell of Judicial Watch). With the re-publication of the USADF website at the direction of FELEKE and ZAHUI, the press release was reposted and affirmatively recirculated after its initial publication. The press release remained published and accessible on the USADF website through at least November 18, 2025 when the website was taken down a second time. The press release did not identify PLAINTIFF by name. PLAINTIFF had separated from the Corporation nearly three years before its publication and had no occasion or reason to monitor the Corporation's website. No reasonable person in PLAINTIFF's position would have discovered the publication sooner than PLAINTIFF did. On information and belief, each affirmative recirculation of the press release after its initial publication—including its recirculation in and after November 2025—was intended to and did reach new and additional audiences, and each such recirculation constituted a separate and distinct publication.

### *Q. THE DECEMBER 18, 2025 STATEMENTS BY ADKINS*

146. On December 18, 2025`, ADKINS published false and malicious statements of and concerning PLAINTIFF, including that PLAINTIFF was a "habitual fabulist" and that

PLAINTIFF "flouted black-letter rules of legal ethics" (the "Fabulist Statements"). PLAINTIFF was not a party to the proceeding in which ADKINS made these statements, and the statements bore no relation to the subject matter of the relief ADKINS sought in that proceeding.

147. On information and belief, ADKINS, personally or through persons acting at his direction, published the Fabulist Statements outside of any judicial proceeding by furnishing the draft pleading containing them to the news media *before the pleading was filed with the court.* The Fabulist Statements were thereafter republished to the general public through filing with the U.S. District Court for the District of Columbia. ADKINS' former executive assistant Battle is a defendant in the same litigation, evidencing that ADKINS' use of litigation against former Corporation employees who reported wrongdoing is a pattern and not an isolated dispute with PLAINTIFF.

148. The Fabulist Statements rested, in substantial part, on a single newspaper article published by the Fairfax County Times in September 2023, during the closing weeks of PLAINTIFF's contested campaign for the Fairfax County School Board. In publishing the Fabulist Statements, ADKINS seized upon that lone, campaign-season article while purposefully disregarding and avoiding the extensive, readily available public record refuting the characterization of PLAINTIFF he sought to convey.

149. That public record includes, among other things, that on November 7, 2023—after the article on which ADKINS relied had been published and was fully known to the electorate—the voters of the Mount Vernon District elected PLAINTIFF to the Fairfax County School Board by an overwhelming margin of more than twenty points, approximately 60% to 39%; that PLAINTIFF's candidacy was publicly endorsed by state legislators, county supervisors, School Board Members, and community leaders; that PLAINTIFF has since served, among other roles, as

the School Board's liaison to division-level advisory committees and participated in the School Board's unanimous adoption of the school division's multi-billion-dollar annual budgets; and that PLAINTIFF has received significant public praise throughout his tenure for his advocacy on behalf of students, families, and educators.

150. The same public record includes dozens of articles in the Fairfax County Times and other regional publications in which PLAINTIFF is quoted in a positive light as an elected official and dedicated advocate for accountability, transparency, and fiscal responsibility—including, by way of example only, the Fairfax County Times' August 30, 2024 article reporting on PLAINTIFF's call for an independent investigation into a high school football scandal involving allegations of "financial impropriety, retaliation, and illegal recruiting of more than 30 football players," and the Fairfax County Times' June 20, 2025 reporting on PLAINTIFF's leading role in the school division's acquisition of the former King Abdullah Academy for $150 million, which will save Fairfax County Public Schools approximately $280 million. No person examining the public record concerning PLAINTIFF—much less a former P/CEO acting with the assistance of legal counsel—could honestly reduce that record to the single article upon which ADKINS seized. ADKINS' election to do so was a purposeful avoidance of the truth.

### *R. DAMAGES TO PLAINTIFF*

151. As a direct, proximate, foreseeable, and intended consequence of DEFENDANTS' conduct alleged herein, PLAINTIFF has suffered and continues to suffer loss and damage, including: the loss of his Federal salary, benefits, and retirement contributions as a GS-15 General Counsel; the loss of (and injuries to) his subsequent employment and earnings; the loss of (and injuries to) professional and business opportunities, including the hundreds of positions for which PLAINTIFF unsuccessfully applied; out-of-pocket costs and expenses, including attorneys' fees

and costs incurred in the investigation and pursuit of his rights; injury to his profession, law practice, professional standing, and community standing; humiliation; and severe emotional pain, suffering, mental anguish, and loss of enjoyment of life.

### *S. ADMINISTRATIVE AND OTHER PROCEEDINGS*

152. Plaintiff filed an EEO complaint on April 1, 2022. An administrative judge granted summary judgment for the Corporation on August 27, 2024; the EEOC affirmed on December 18, 2025. Plaintiff filed an Individual Right of Action appeal with the Merit Systems Protection Board on April 12, 2024, which remains pending. Plaintiff has also filed an action in the United States District Court for the District of Columbia asserting claims of racial discrimination and related claims, which are not asserted here.

### *T. DEFENDANTS ACTED OUTSIDE THE SCOPE OF THEIR EMPLOYMENT AND FOR PERSONAL PURPOSES*

153. The claims asserted in this Complaint are asserted against ADKINS, ZAHUI, and FELEKE in their individual capacities.

154. As to each act and omission alleged herein on which Counts I through VII are founded, each DEFENDANT acted outside the scope of his or her Federal employment in that the conduct: (a) was not of the kind the DEFENDANT was employed to perform, and was instead forbidden to the DEFENDANT by Federal criminal statute, by regulation, and by the Corporation's own policies; (b) as to the conduct specified herein, occurred outside the authorized time and space limits of the DEFENDANT's employment, including conduct undertaken before the DEFENDANT's Federal employment commenced, after it terminated, and from and concerning the DEFENDANT's private residence and private affairs; (c) was not actuated, in whole or in any part, by a purpose to serve the Corporation or the United States, but solely by the personal purposes alleged herein; and (d) to the extent it involved the invocation of law

enforcement against PLAINTIFF, was an outrageous departure from any function of the DEFENDANT's office.

### *U. THE ENTERPRISE AND THE PATTERN OF RACKETEERING ACTIVITY*

155. At all times pertinent hereto, USADF was an "enterprise" within the meaning of 18 U.S.C. § 1961(4): a legal entity—a United States government corporation established by Congress—with an ascertainable structure, a continuing existence, and a common purpose, whose officers, employees, and agents functioned as a continuing unit.

156. At all times pertinent hereto, the activities of the enterprise affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962. USADF administers an annual grant portfolio of approximately $30 million; makes grants to enterprises across the African continent; contracts with vendors and implementing partners in the United States and abroad; transmits funds, invoices, and communications by interstate and foreign wire; and employs personnel who work in and travel between the District of Columbia, Virginia, and foreign countries.

157. Each DEFENDANT is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962, and each DEFENDANT is distinct from the enterprise. Each DEFENDANT was employed by and associated with the enterprise, and each participated, directly and indirectly, in the conduct of the enterprise's affairs: (a) ZAHUI as Director of Financial Management, controlling the Corporation's finances, procurement, and vendor payments, and from on or about February 10, 2025 as a member of the three-member leadership committee performing the functions of the P/CEO; (b) FELEKE as Acting P/CEO, as Chief Program Officer, and from on or about February 10, 2025 as a member of the same leadership committee; and (c) ADKINS as P/CEO from January 18, 2022 through February 10, 2025. Each DEFENDANT occupied a position in the operation and management of the enterprise and directed its affairs.

158. DEFENDANTS conducted and participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple related predicate acts committed within ten years of one another, from at least June 2020 and continuing through at least 2025, as follows:

159. *Bribery and unlawful gratuities, 18 U.S.C. § 201.* Between at least August 2019 and August 2022—and, as adjudicated in the judgment of conviction, through April 30, 2023—ZAHUI, a public official, directly received, accepted, and agreed to receive and accept things of value personally: $12,000 in cash, transmitted to his bank account in eight separate payments by Ganiam, for and because of official acts performed and to be performed by ZAHUI, including ensuring that Ganiam continued to secure Corporation contracts, directing Corporation funds to Ganiam through pass-through invoices, and approving Ganiam's invoices, in violation of 18 U.S.C. § 201(c)(1)(B). Each acceptance of a payment was a separate act of racketeering. ZAHUI's guilty plea of February 23, 2026, his Statement of Offense executed under penalty of perjury, and the judgment of conviction entered May 27, 2026 conclusively establish this conduct.

160. *Wire fraud, 18 U.S.C. § 1343, including deprivation of honest services, 18 U.S.C. § 1346.* From June 2020 through December 2023, ZAHUI, aided and abetted by the contractor, devised and executed a scheme and artifice to defraud the Corporation and the United States of money and property— through more than 20 marked-up, pass-through invoices on which the Corporation paid at least $617,625.49 and from which Ganiam collected $134,886.34 in mark-ups despite performing no legitimate work—and to deprive the Corporation and the public of their intangible right to ZAHUI's honest services as Director of Financial Management, through bribery and kickbacks. In furtherance of the scheme, ZAHUI and Ganiam transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, and signals,

including, on information and belief, the electronic submission of each fraudulent invoice, the electronic approval of each such invoice, and the electronic disbursement of each payment thereon. Each such transmission was a separate act of racketeering in violation of 18 U.S.C. § 1343. The wires in furtherance of the scheme included, without limitation, ZAHUI's August 6, 2020 electronic message to the contractor confirming that the staffing vendor's invoices "will be changing" to conceal their true nature, and the August 7, 2020 electronic transmission of the falsified replacement invoice reciting "IT Support for Logistical Assistance," each a separate violation of 18 U.S.C. § 1343. On information and belief, the March 14, 2025 press release—a knowingly false publication transmitted by interstate wire from the Corporation's Washington, DC headquarters in furtherance of the scheme to conceal the fraud and to preserve the Corporation appropriations from which the scheme was fed—was a further act in furtherance of the scheme and a further violation of § 1343.

161. *Mail fraud, 18 U.S.C. § 1341.* On information and belief, in furtherance of the same scheme, ZAHUI and Ganiam placed and caused to be placed in the mails, and delivered by private and commercial interstate carrier, contract documents, invoices, and payments, each such use of the mails constituting a separate act of racketeering in violation of 18 U.S.C. § 1341.

162. *Tampering with a witness, victim, or informant, 18 U.S.C. § 1512.* DEFENDANTS knowingly used intimidation, threats, and corrupt persuasion toward PLAINTIFF and other witnesses, and engaged in misleading conduct, with intent to influence, delay, and prevent testimony and cooperation in official proceedings; to cause and induce persons to withhold testimony, records, and documents from official proceedings; and to hinder, delay, and prevent the communication to law enforcement officers of the United States—including the USAID OIG—of information relating to the commission and possible commission of Federal offenses, in violation

of 18 U.S.C. § 1512(b) and (c), including without limitation: (a) ZAHUI's November 19, 2021 refusal to permit the Corporation's General Counsel access to procurement records; (b) FELEKE's December 2021 directives that PLAINTIFF omit his findings of wrongdoing from his investigation report; (c) FELEKE's December 2, 2021 order halting PLAINTIFF's investigation; (d) ADKINS' January 28, 2022 cease-and-desist memorandum prohibiting PLAINTIFF from communicating with any Corporation employee—including the witnesses to the misconduct PLAINTIFF had reported—under threat of discipline; (e) the instruction to the USPS EEO investigator, at Corporation request, not to interview PLAINTIFF; and (f) ZAHUI's November 29, 2021 communication alerting the Corporation supervisor of witness Elizabeth DeFreest that DeFreest had disclosed unlawful procurement practices to PLAINTIFF, which caused DeFreest to withdraw from the investigation out of fear for her employment. Each such act was a separate act of racketeering.

163. *Retaliating against a witness, victim, or informant, 18 U.S.C. § 1513(e).* DEFENDANTS knowingly, and with intent to retaliate, took actions harmful to PLAINTIFF, including interference with his lawful employment and livelihood and attempts to get him arrested, for providing to law enforcement officers—including the USAID OIG and, through it, the USDOJ—truthful information relating to the commission and possible commission of Federal offenses, in violation of 18 U.S.C. § 1513(e), including without limitation: (a) the January 21, 2022 indefinite suspension; (b) the January 28, 2022 gag order; (c) FELEKE's January 30, 2022 false statement to Federal law enforcement, made in an attempt to cause PLAINTIFF's arrest and prosecution; (d) the January 2022 sham investigation and the 76-page compilation; (e) the refusal to answer eight successive due-process requests; (f) PLAINTIFF's July 2, 2022 constructive discharge; (g) ADKINS' scheme to transmit derogatory information about PLAINTIFF to FERC;

(h) the March 14, 2025 press release falsely branding PLAINTIFF a "disgruntled former employee . . . under OIG investigation since 2021"; and (i) ADKINS' December 18, 2025 publication of the Fabulist Statements described in Section Q above and its accompanying publication through the media. Each such act was a separate act of racketeering.

164. *Obstruction of justice and of criminal investigations, 18 U.S.C. §§ 1503, 1510, and 1512(c).* DEFENDANTS corruptly endeavored to influence, obstruct, and impede the due administration of justice and the communication of information relating to Federal offenses to criminal investigators, including through the suppression of PLAINTIFF's investigation report, the concealment of the misconduct PLAINTIFF reported, and ZAHUI's knowingly false statements to Federal criminal investigators in 2024—false statements to which ZAHUI has now pled guilty. Each such act was a separate act of racketeering.

165. *Money laundering, 18 U.S.C. §§ 1956 and 1957.* On information and belief, ZAHUI conducted and attempted to conduct financial transactions involving the proceeds of the unlawful activity described above—including the receipt, transfer, deposit, and expenditure of cash payments structured to avoid detection—knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds, in violation of 18 U.S.C. §§ 1956 and 1957.

166. *Interstate travel and use of interstate facilities in aid of racketeering, 18 U.S.C. § 1952.* On information and belief, DEFENDANTS traveled in interstate commerce between Virginia and the District of Columbia, and used facilities in interstate commerce, including interstate wire communications, with intent to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity described above, including

bribery in violation of the laws of the United States and of the District of Columbia, and thereafter performed and attempted to perform acts in furtherance thereof, in violation of 18 U.S.C. § 1952.

167. The predicate acts alleged above are related within the meaning of 18 U.S.C. § 1961(5) and *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989): they had the same and similar purposes (the enrichment of ZAHUI and, on information and belief, of other Corporation officials and their associates; the concealment of egregious corruption at the Corporation; the elimination and neutralization of the Corporation's oversight functions; and the preservation of DEFENDANTS' positions, reputations, and control of the Corporation); the same and similar participants (DEFENDANTS and their confederates); the same and similar victims (the Corporation, the United States, and PLAINTIFF); and the same and similar methods of commission (the abuse of official authority, the corruption and suppression of oversight mechanisms, and the retaliatory destruction of those who reported).

168. The predicate acts alleged above are continuous. They span a closed period of substantially more than two years—from at least June 2020 through at least 2025—and constituted the regular way in which DEFENDANTS conducted the affairs of the enterprise. The pattern also carried a specific threat of continuing racketeering activity. The scheme continued until it was interrupted by the criminal investigation PLAINTIFF's disclosures produced, and DEFENDANTS' campaign of retaliatory falsehood against PLAINTIFF continued into 2025 and, in the case of ADKINS, into December 2025.

169. PLAINTIFF was injured in his business and property by reason of the pattern of racketeering activity, and directly by reason of the predicate acts of witness tampering and witness retaliation of which he was the immediate target, including the loss of his Federal salary, benefits, and retirement contributions; the loss of (and injuries to) his subsequent employment and earnings;

the loss of (and injuries to) professional and business opportunities; and out-of-pocket costs and expenses. These injuries were the direct, intended, and proximate result of the predicate acts directed at PLAINTIFF, and no other victim is better situated than PLAINTIFF to vindicate them.

## *V. DEFENDANTS' AGREEMENT, CONCERTED ACTION, AND JOINT RESPONSIBILITY*

170. By no later than January 7, 2022—and, as between FELEKE and ZAHUI, by no later than December 1, 2021 when they acted in concert to obstruct the procurement review and to suppress and terminate PLAINTIFF's authorized investigation—DEFENDANTS entered into an agreement among themselves, and with others known and unknown, to accomplish unlawful objectives and to accomplish objectives by unlawful and tortious means. The objects of the agreement were: (a) to halt, suppress, and conceal PLAINTIFF's investigation and its findings; (b) to remove PLAINTIFF from his position and drive him from Federal service; (c) to discredit and destroy PLAINTIFF's reputation and credibility, including by defaming him and by attempting to cause his arrest; (d) to punish PLAINTIFF for, and to deter him from, his protected disclosures to Congress and the USAID OIG; (e) to interfere with PLAINTIFF's subsequent employment and professional opportunities; and (f) thereby to conceal, protect, and perpetuate the rampant fraud, waste, and abuse alleged herein, from which, on information and belief, each DEFENDANT benefited. The agreement was formed and pursued for DEFENDANTS' personal ends and outside the scope of their Federal employment, for the reasons alleged in Section T; indeed, it was formed in part before ADKINS' Federal employment began, at a time when ADKINS held no Federal office at all.

171. The formation of the agreement is documented in DEFENDANTS' own contemporaneous writings: (a) ZAHUI's January 7, 2022 email to IBC announced that the

incoming President wished to undo "a hiring (senior level) done during the interim period" whose "incumbent is defying authority," and represented that "we do have the specifics documented"; (b) ZAHUI's January 10, 2022 email confirmed that he had "checked with Travis (incoming President & CEO)"; (c) ZAHUI's January 11, 2022 email identified the "[p]articipants on our side" for the joint call concerning PLAINTIFF as ADKINS, FELEKE, and ZAHUI; (d) FELEKE and ZAHUI assembled the 76-page compilation captioned "Memo on GC DUNNE Conduct" and caused it to be delivered to ADKINS on his first day in office; and (e) ADKINS executed the plan — suspending PLAINTIFF on his fourth day in office, before he had spent a single working day with him — precisely as ZAHUI had arranged it with IBC before ADKINS was sworn in. Each DEFENDANT thereby manifested his or her assent to, and joined, the common design.

172. In furtherance of and pursuant to that agreement, DEFENDANTS committed numerous overt acts—not merely statements, but concrete actions and conduct—including, without limitation: (a) ZAHUI's November 29, 2021 email alerting the Corporation supervisor of witness Elizabeth DeFreest that DeFreest had disclosed unlawful procurement practices to PLAINTIFF, which drove that witness from the investigation; (b) FELEKE's December 2021 directives that PLAINTIFF omit his findings of wrongdoing from his report, and the December 2, 2021 order halting PLAINTIFF's investigation; (c) ZAHUI's January 7 through January 11, 2022 coordination with IBC to engineer PLAINTIFF's removal, undertaken in consultation with ADKINS before ADKINS held any Federal office and with FELEKE identified as a joint "[p]articipant"; (d) the assembly by FELEKE and ZAHUI of the 76-page compilation captioned "Memo on GC DUNNE Conduct," its delivery to ADKINS on his first day in office, and ZAHUI's January 19, 2022 transmission of it to IBC; (e) the January 19, 2022 exclusion of the Office of General Counsel, for the first time in Corporation history, from the Senior Leadership Team; (f)

ADKINS' January 21, 2022 suspension of PLAINTIFF, and his successive extensions of that suspension by memoranda dated February 25, 2022, on or about April 10, 2022, and June 1, 2022; (g) ADKINS' January 28, 2022 cease-and-desist memorandum prohibiting PLAINTIFF, under threat of discipline, from contacting any Corporation employee except ADKINS, severing PLAINTIFF from every witness to the misconduct he had reported; (h) FELEKE's January 28, 2022 telephone report concerning PLAINTIFF to the FCPD, and her preparation and delivery, on or about January 30, 2022, of the Feleke Statement to Federal criminal investigators in an attempt to cause PLAINTIFF's arrest; (i) the January 21, 2022 demand by the Chief Information Officer for the return of PLAINTIFF's equipment on the stated ground that PLAINTIFF "no longer work[ed] at USADF," and ZAHUI's dispatch, on or about February 2, 2022, of shipping boxes, a demand letter threatening paycheck deductions, and an Exit Clearance Form reserved for departing employees; (j) the February 2022 commissioning of a third-party investigation of PLAINTIFF through the United States Postal Service, ZAHUI's February 3, 2022 meeting with USPS representatives to initiate it, the instruction, at Corporation request, that the investigator not interview PLAINTIFF, and DEFENDANTS' subsequent refusal to review and approve the final report; (k) the refusal to answer any of PLAINTIFF's eight successive written requests for due process between February 5 and June 9, 2022; (l) ADKINS' June 15, 2022 directive that IBC transmit derogatory information concerning PLAINTIFF to FERC, and his written declaration that if IBC would not do so, "USADF will have to take the matter into its own hands"; (m) the publication of the March 14, 2025 press release on the Corporation's official website, and its maintenance, republication, and affirmative recirculation through at least November 2025; and (n) ADKINS' December 18, 2025 filing of the pleading containing the Fabulist Defamation and, on information and belief, his furnishing of that pleading to the news media.

173. Each of these overt acts was performed by one or more DEFENDANTS with the knowledge of, and in furtherance of the common design of, all of them. Each DEFENDANT knew the general character and scope of the design, intended to further it, and lent his or her office, authority, participation, or silence to acts he or she did not personally perform. No DEFENDANT ever withdrew from, repudiated, or disclosed the design; each instead ratified, adopted, and built upon the acts of the others, from ZAHUI's pre-inauguration engineering of the removal, through FELEKE's reports to two law enforcement agencies, through ADKINS' execution of the suspension, gag order, sham investigation, and FERC scheme, to the coordinated publications of 2025. The acts, taken together, constitute a single coordinated course of conduct extending from November 2021 through at least December 2025 that no DEFENDANT could have accomplished alone.

174. In addition, and independently, each DEFENDANT knew that the conduct of the other DEFENDANTS alleged herein was tortious and unlawful, and each DEFENDANT knowingly and substantially assisted, encouraged, and participated in that conduct — including by supplying the pretexts, authorizations, personnel actions, statements, publications, and institutional cover for it, as alleged in Sections A through V above.

175. As a consequence of the agreement, concerted action, and substantial assistance alleged in this Section, each DEFENDANT is jointly and severally liable for every tortious and unlawful act committed by any other DEFENDANT in furtherance of the common design, whether or not the particular DEFENDANT personally performed the act; each act and statement of each DEFENDANT in furtherance of the design is attributable to all; and the liability so imputed extends to each of the claims pleaded in the Counts below.

### *W. STATEMENT REGARDING CLAIMS AND CONTENTIONS*

176. The claims in this Complaint are warranted by existing law or, with respect to Counts VII and VIII by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. The averments of fact in this Complaint have evidentiary support or, where specifically identified as made on information and belief, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

### COUNT I
### DEFAMATION AND DEFAMATION PER SE
### (FELEKE AND ADKINS—THE "THREAT TO CHILDREN" DEFAMATION)

177. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

178. In making and publishing the statements alleged in this Count, FELEKE and ADKINS acted outside the scope of their Federal employment: FELEKE spoke as a private complainant about purported private fears concerning her own home and her own children, in reports she made from and concerning her private residence, that she concealed from the Corporation's counsel and Board, and that served no function of any office she held. ADKINS' concurrence, encouragement, and participation were likewise personal: they furthered the removal scheme he had joined before taking office, protected his friend of approximately 20 years, former P/CEO Glin, from PLAINTIFF's ethics enforcement, and served no function of his office, which he had held for fewer than two weeks and under which he owed PLAINTIFF the process he was simultaneously denying

179. On or about January 30, 2022, and continuing thereafter, FELEKE, with the concurrence, encouragement, and participation of ADKINS, made and published, in writing and on information and belief orally as well, to agents and employees of the Federal Protective Service,

false and malicious statements of and concerning PLAINTIFF, including without limitation that PLAINTIFF was "unhinged and unstable," that PLAINTIFF "sent an extortion letter to USADF," that PLAINTIFF's conduct was "unstable and potentially dangerous behavior," and that PLAINTIFF "may present a clear danger to me and the safety of my family," such that FELEKE had "warn[ed her] own children of the potential threat" as "they walk to and from school alone" (collectively, the "Threat to Children Defamation").

180. The Threat to Children Defamation was made of and concerning PLAINTIFF, who was expressly named therein.

181. The Threat to Children Defamation was false. PLAINTIFF had never threatened FELEKE, her children, or any other person; had never engaged in any conduct that could reasonably be characterized as dangerous or unstable; had never sent an extortion letter to USADF or anyone else—the communication so characterized was an attorney's confidential settlement proposal, which FELEKE's own statement elsewhere described as "his attempt to negotiate a settlement"; and had done nothing beyond performing his lawful duties as General Counsel and asserting his legal rights.

182. The Threat to Children Defamation was defamatory and defamatory *per se*. It falsely charged PLAINTIFF with the commission of a crime—extortion; it falsely imputed to PLAINTIFF conduct—instability, dangerousness, and menace to children—incompatible with the exercise of his profession as an attorney and his office as an elected school board member entrusted with the welfare of children; and it tended to injure PLAINTIFF in his trade, profession, and community standing and to make PLAINTIFF appear odious, infamous, and ridiculous. The Threat to Children Defamation is actionable irrespective of special harm, and its publication also caused PLAINTIFF special harm.

183. FELEKE and ADKINS published the Threat to Children Defamation without privilege to third parties. The Threat to Children Defamation was not a filing in any judicial proceeding; no absolute privilege attaches to it.

184. The Threat to Children Defamation was made intentionally, with knowledge of its falsity and in reckless disregard of its falsity, and with negligence and gross negligence. FELEKE's contemporaneous, materially inconsistent account to the Fairfax County Police Department establishes her knowledge of falsity. The timing establishes her motive..

185. ADKINS and ZAHUI concurred in, encouraged, directed, aided and abetted, and conspired in the making and publication of the Threat to Children Defamation, and is jointly and severally liable therefor.

186. DEFENDANTS concealed the making, content, and falsity of the Threat to Children Defamation from PLAINTIFF. PLAINTIFF did not learn, and could not with reasonable diligence have learned, of the falsity of the Threat to Children Defamation until January 30, 2026, when PLAINTIFF received a copy of the Feleke Statement from a third party.

187. When evaluated in context, considering the entire communication and construed in the sense in which the persons to whom it was published would ordinarily understand it, the Threat to Children Defamation was defamatory as a matter of law, defamatory *per se*, and was knowingly and maliciously made and published with knowledge of its falsity.

188. As a direct, proximate, foreseeable, and intended consequence of the Threat to Children Defamation, PLAINTIFF suffered loss and damage, including injury to reputation, humiliation, and pain and suffering.

189. DEFENDANTS committed the acts alleged in this Count in concert, pursuant to and in furtherance of agreement and common design, and each DEFENDANT is jointly and severally

liable for the acts of every other DEFENDANT committed in furtherance thereof, and for the tortious conduct each knowingly and substantially assisted and encouraged.

190. The conduct of DEFENDANTS was so malicious, wanton, and egregious that punitive damages are warranted.

**COUNT II**
**DEFAMATION AND DEFAMATION PER SE**
**(FELEKE and ZAHUI—The Website Defamation)**

191. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

192. In making and publishing the Website Defamation, ZAHUI and FELEKE—on information and belief, in collaboration with ADKINS, who was no longer employed by the Corporation—acted outside the scope of their Federal employment: they appropriated the Corporation's official channels, without Board authorization and contrary to the Corporation's own records, to publish falsehoods that served only ZAHUI's concealment of his crimes and DEFENDANTS' discrediting of PLAINTIFF for reporting the rampant fraud, waste, and abuse.

193. On March 14, 2025, and continuing thereafter through republication, maintenance, and affirmative recirculation through at least November 2025, FELEKE and ZAHUI made, published, and caused to be published on the USADF website, and aided and abetted and conspired to make and publish, including the false and malicious claims that the "primary source" of the allegations of fraud, waste, and abuse at the Corporation was "a disgruntled former employee who has been under OIG investigation since 2021," that the sources of those allegations were "misleading and unreliable," that "[t]he agency itself reported most of these allegations to the Office of the Inspector General (OIG)," and that more than a decade of audits "have found no evidence of fraud or misuse of funds" (collectively, the "Website Defamation").

194. The Website Defamation could not have been published without the instruction, knowledge, and consent of FELEKE and ZAHUI, who, from on or about February 10, 2025, controlled the Corporation's public communications as members of the three-member leadership committee performing the functions of the P/CEO.

195. The Website Defamation was made of and concerning PLAINTIFF. PLAINTIFF was readily and reasonably identifiable as the "disgruntled former employee" to the entire relevant audience—Members of Congress, congressional staff, USAID OIG personnel, journalists, and others.

196. The Website Defamation was false, and FELEKE and ZAHUI knew it was false when it was published: PLAINTIFF initiated the 2021 investigation of USADF; USADF leadership, including FELEKE and ZAHUI, sought to prevent and terminate that investigation; PLAINTIFF was not under OIG investigation at all, much less for four years—he was the source of the USAID OIG referral, not its target; USADF did not report the allegations to the USAID OIG, as the USAID OIG's August 29, 2024 Management Advisory to ADKINS formally found; and the audits had "found no evidence of fraud" only because the fraud was being committed and concealed by the Director of Financial Management who approved the publication. The subsequent conviction of ZAHUI establishes the falsity of the Website Defamation as a matter of public record.

197. The Website Defamation was defamatory and defamatory *per se*. It falsely charged PLAINTIFF with being the subject of a four-year Federal investigation—an imputation of criminal conduct; it falsely imputed to PLAINTIFF dishonesty and unreliability incompatible with his profession as an attorney and his office as an elected official; and it tended to injure PLAINTIFF in his trade, profession, and community standing. It is actionable irrespective of special harm, and its publication also caused PLAINTIFF special harm.

198. FELEKE and ZAHUI published the Website Defamation without privilege to third parties—indeed, to the world, on a United States Government website carrying the apparent imprimatur of the United States—and, to the extent any privilege is asserted, their actual malice and knowledge of falsity defeats and precludes reliance on any such privilege.

199. The Website Defamation was made intentionally, with knowledge of its falsity and in reckless disregard of its falsity, and with negligence and gross negligence. ZAHUI knew that he, and not PLAINTIFF, was the person under Federal investigation: Federal agents had interviewed him in 2024, and he had lied to them. ZAHUI thus published to the world that PLAINTIFF was "under OIG investigation since 2021" at the very moment ZAHUI knew that he himself was the target of the investigation his publication denied.

200. PLAINTIFF was not aware of the Website Defamation, and could not with reasonable diligence have become aware of it, before July 29, 2025 at the earliest.

201. When evaluated in context, considering the entire communication, the willful and knowing omission of critical facts, and the sense in which it would be understood by the persons to whom it was addressed, the Website Defamation was defamatory as a matter of law, defamatory *per se*, and was knowingly and maliciously made and published with knowledge of its falsity.

202. As a direct, proximate, foreseeable, and intended consequence of the Website Defamation, PLAINTIFF suffered loss and damage, including injury to reputation, humiliation, and pain and suffering.

203. DEFENDANTS committed the acts alleged in this Count in concert, pursuant to and in furtherance of agreement and common design, and each DEFENDANT is jointly and severally liable for the acts of every other DEFENDANT committed in furtherance thereof, and for the tortious conduct each knowingly and substantially assisted and encouraged.

204. The conduct of FELEKE and ZAHUI was so malicious, wanton, and egregious that punitive damages are warranted.

**COUNT III**
**DEFAMATION AND DEFAMATION PER SE**
**(ADKINS—THE DECEMBER 2025 "HABITUAL FABULIST" DEFAMATION)**

205. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

206. ADKINS made and published the Fabulist Defamation more than ten months after his Federal employment with the Corporation ended on February 10, 2025. It was not, and could not have been, within the scope of any Federal employment.

207. On December 18, 2025, ADKINS published false and malicious statements of and concerning PLAINTIFF, including that PLAINTIFF was a "habitual fabulist" and that PLAINTIFF "flouted black-letter rules of legal ethics" (the "Fabulist Defamation"). PLAINTIFF was not a party to the proceeding in which ADKINS made these statements, and the statements bore no relation to the subject matter of the relief ADKINS sought in that proceeding.

208. On information and belief, ADKINS, personally or through persons acting at his direction, published the Fabulist Statements outside of any judicial proceeding by furnishing the draft pleading containing them to the news media *before the pleading was filed with the court.* The Fabulist Statements were thereafter republished to the general public through filing with the U.S. District Court for the District of Columbia. That republication is a publication on which this Count is founded, and no privilege attaches to it.

209. The Fabulist Defamation was made of and concerning PLAINTIFF, who was expressly named therein, and was false: PLAINTIFF fabricated nothing—his reports were true, as the USDOJ, the USAID OIG, the GAO, and the United States Senate have each confirmed—and

PLAINTIFF at all times complied with the rules of legal ethics, including in his service as the Corporation's DAEO.

210. The Fabulist Defamation was defamatory and defamatory *per se*: an accusation that an attorney is a "habitual fabulist" who "flouted black-letter rules of legal ethics" imputes professional dishonesty and unfitness, injures PLAINTIFF in his profession, and is actionable irrespective of special harm; its publication also caused PLAINTIFF special harm.

211. The Fabulist Defamation was made intentionally, with knowledge of its falsity and in reckless disregard of its falsity: by December 18, 2025, ZAHUI had been referred for prosecution, the USAID OIG had confirmed the Corporation's failures in writing to ADKINS himself, and the GAO Report corroborating PLAINTIFF's disclosures had been public for three months. ADKINS likewise published the Fabulist Defamation in purposeful reliance on a single campaign-season newspaper article while deliberately avoiding and disregarding the contrary public record—including PLAINTIFF's subsequent election, his record of public service—and that purposeful avoidance of the truth further establishes ADKINS' actual malice.

212. DEFENDANTS committed the acts alleged in this Count in concert, pursuant to and in furtherance of the agreement and common design, and each DEFENDANT is jointly and severally liable for the acts of every other DEFENDANT committed in furtherance thereof, and for the tortious conduct each knowingly and substantially assisted and encouraged.

213. As a direct, proximate, foreseeable, and intended consequence of the Fabulist Defamation, PLAINTIFF suffered loss and damage, including injury to reputation, humiliation, and pain and suffering, and the conduct of ADKINS was so malicious, wanton, and egregious that punitive damages are warranted.

**COUNT IV**
**FALSE LIGHT INVASION OF PRIVACY**
**(ALL DEFENDANTS)**

214. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

215. Each of the publications alleged in this Count was made outside the scope of any Defendant's Federal employment. By making and publishing the Threat to Children Defamation, the Website Defamation, and the Fabulist Defamation (collectively, the "Defamations"), DEFENDANTS gave publicity to matters concerning PLAINTIFF that placed PLAINTIFF before third parties, and—in the case of the Website Defamation, before the public at large through a United States Government website—in a false light: as a dangerous, unstable, and menacing person; as a would-be extortionist; as a threat to children; as a "disgruntled" and "unreliable" malcontent; as the four-year subject of a Federal criminal investigation; and as a professional liar and ethics violator—when in truth PLAINTIFF was the Corporation's General Counsel who lawfully reported corruption that the United States has since prosecuted and confirmed.

216. The false light in which PLAINTIFF was placed is and would be highly offensive to a reasonable person.

217. DEFENDANTS had knowledge of, and acted in reckless disregard of, the falsity of the Defamations, the defamatory meaning conveyed and implied by the Defamations, and the false light in which PLAINTIFF would be placed, as alleged with particularity in Counts I through III above.

218. Each of the DEFENDANTS authorized, condoned, and ratified the unlawful conduct of the other DEFENDANTS and of their agents.

219. As a direct, proximate, and foreseeable consequence of DEFENDANTS' misconduct, PLAINTIFF sustained loss, injury, and damage, including severe emotional and mental distress.

220. DEFENDANTS committed the acts alleged in this Count in concert, pursuant to and in furtherance of agreement and common design, and each DEFENDANT is jointly and severally liable for the acts of every other DEFENDANT committed in furtherance thereof, and for the tortious conduct each knowingly and substantially assisted and encouraged.

221. DEFENDANTS committed the acts alleged in this Count with the wrongful intention of injuring PLAINTIFF, with an improper motive amounting to malice, and in conscious disregard of PLAINTIFF's rights. Punitive damages are warranted.

**COUNT V**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(ALL DEFENDANTS)**

222. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

223. The conduct alleged in this Count was actuated solely by DEFENDANTS' personal purposes—the concealment of ZAHUI's crimes, the preservation of the benefits each DEFENDANT derived from the corrupt operation of the Corporation, the protection of DEFENDANTS' positions and reputations, and personal retribution against PLAINTIFF—and not, in whole or in any part, by any purpose to serve the Corporation, and was outside the scope of each Defendant's Federal employment.

224. For personal gain, and in order to conceal illegal activity and corruption, DEFENDANTS did, conspired to, and aided and abetted one another to, maliciously damage and destroy PLAINTIFF's professional standing and his professional and personal reputation, and to

humiliate and embarrass him, knowing that the statements they were making about PLAINTIFF were false and defamatory and that the actions they took against PLAINTIFF were illegal and improper.

225. DEFENDANTS' conduct was extreme and outrageous. It was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and was atrocious and utterly intolerable in a civilized community.

226. DEFENDANTS' extreme and outrageous conduct included, without limitation: (a) reporting PLAINTIFF to two law enforcement agencies within a span of three days in an attempt to cause the arrest and prosecution of a man DEFENDANTS knew had committed no crime, including by falsely reporting to Federal criminal investigators, in a document styled as a sworn affidavit, that PLAINTIFF had committed extortion and posed a physical danger to a colleague's children as they walked to and from school; (b) obstructing a lawfully authorized internal investigation into corruption and directing that its findings be suppressed; (c) intimidating witnesses who cooperated with that investigation; engineering PLAINTIFF's removal before the new P/CEO had spent a single working day with him; (d) suspending PLAINTIFF indefinitely while falsely promising him the charges and an opportunity to be heard; (e) ignoring eight successive written requests for the most basic due process over five months; (f) commissioning an investigation of PLAINTIFF while instructing the investigator not to interview him; scheming to poison PLAINTIFF's relationship with a subsequent employer; and (g) years after PLAINTIFF's departure, publishing to the world that PLAINTIFF was a disgruntled former employee who had been under criminal investigation for four years, when DEFENDANTS knew that PLAINTIFF was in fact the whistleblower whose disclosures ultimately produced ZAHUI's own criminal conviction.

227. DEFENDANTS intended to cause PLAINTIFF severe emotional distress, or acted in reckless disregard of the probability of causing PLAINTIFF severe emotional distress.

228. DEFENDANTS' conduct was a substantial factor in, and the actual and proximate cause of, the severe emotional and mental distress suffered by PLAINTIFF.

229. As a direct, proximate, foreseeable, and intended consequence of DEFENDANTS' conduct, PLAINTIFF suffered severe emotional distress, loss, and damage, including pain and suffering.

230. DEFENDANTS committed the acts alleged in this Count in concert, pursuant to and in furtherance of agreement and common design, and each DEFENDANT is jointly and severally liable for the acts of every other DEFENDANT committed in furtherance thereof, and for the tortious conduct each knowingly and substantially assisted and encouraged.

231. The conduct of DEFENDANTS was so malicious, wanton, and egregious that punitive damages are warranted.

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS ADVANTAGE AND EMPLOYMENT
## (ALL DEFENDANTS)

232. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

233. The interference alleged in this Count was directed at the employment and prospects of a person who had separated, or was separating, from the Corporation, and included conduct—the December 18, 2025 Fabulist Defamation—undertaken long after ADKINS' own Federal employment had ended. It served no purpose of the Corporation, was not of the kind any Defendant was employed to perform, and was outside the scope of each Defendant's Federal employment.

234. PLAINTIFF had valid business relationships and expectancies, including his employment relationship with FERC commencing July 3, 2022; his prospective continued Federal legal career; his candidacies for the hundreds of positions for which he applied; and his professional reputation and practice as an attorney and elected official, each with a probability of future economic benefit to PLAINTIFF.

235. DEFENDANTS knew of those relationships and expectancies. ADKINS expressly acknowledged PLAINTIFF's FERC employment in writing and declared the Corporation's intent that "FERC . . . be made aware of Mr. DUNNE's conduct in this matter."

236. DEFENDANTS intentionally and improperly interfered with those relationships and expectancies, by unlawful and independently tortious means, including the transmission and threatened transmission of false and derogatory information to FERC; the Website Defamation, published to the universe of PLAINTIFF's actual and prospective employers, clients, and constituents; and the Fabulist Defamation.

237. DEFENDANTS' interference was accomplished with malice and without justification or privilege, for personal purposes.

238. As a direct, proximate, and foreseeable consequence of DEFENDANTS' interference, PLAINTIFF's expectancies were damaged and destroyed, and PLAINTIFF sustained loss of (and injury to) employment, earnings, and professional opportunity, in addition to injury to reputation and severe emotional distress.

239. DEFENDANTS committed the acts alleged in this Count in concert, pursuant to and in furtherance of agreement and common design, and each DEFENDANT is jointly and severally liable for the acts of every other DEFENDANT committed in furtherance thereof, and for the tortious conduct each knowingly and substantially assisted and encouraged.

240. The conduct of DEFENDANTS was so malicious, wanton, and egregious that punitive damages are warranted.

**COUNT VII**
**AIDING AND ABETTING**
**(ALL DEFENDANTS)**

241. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

242. The assistance and encouragement alleged in this Count were rendered for DEFENDANTS' personal ends and outside the scope of each Defendant's Federal employment.

243. Each DEFENDANT knew that the conduct of the other DEFENDANTS alleged herein constituted breaches of duty and tortious acts against PLAINTIFF.

244. Each DEFENDANT knowingly and substantially assisted, encouraged, and participated in the tortious conduct of the other DEFENDANTS, including by supplying pretexts, authorizations, personnel actions, statements, publications, and institutional cover for that conduct.

245. Each DEFENDANT is therefore jointly and severally liable for the tortious conduct of each other DEFENDANT so assisted and encouraged.

246. DEFENDANTS committed the acts alleged in this Count in concert, pursuant to and in furtherance of agreement and common design of this Complaint, and each DEFENDANT is jointly and severally liable for the acts of every other DEFENDANT committed in furtherance thereof, and for the tortious conduct each knowingly and substantially assisted and encouraged.

247. As a direct, proximate, and foreseeable consequence of DEFENDANTS' conduct, PLAINTIFF sustained loss, injury, and damage, and punitive damages are warranted.

**COUNT VIII**
**VIOLATION OF CONSTITUTIONAL RIGHTS**
**FIRST AMENDMENT RETALIATION AND DENIAL OF DUE PROCESS**
**(ALL DEFENDANTS)**

248. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

249. PLAINTIFF engaged in speech and petitioning activity protected by the First Amendment to the United States Constitution, including his reports of corruption to Congress and the USAID OIG, made as a citizen on matters of profound public concern.

250. Acting under color of Federal authority, DEFENDANTS retaliated against PLAINTIFF for that protected activity, and deprived PLAINTIFF of liberty and property interests in his employment, his professional licensure and standing, and his reputation, without notice, without identification of charges, without access to evidence, and without any opportunity to be heard, and with deception and false promises and representations about PLAINTIFF'S due process, rights and procedures, in a sham appeal process, in violation of the First Amendment and of the Due Process Clause of the Fifth Amendment.

251. PLAINTIFF asserts this claim for damages directly under the Constitution. PLAINTIFF acknowledges that the availability of a damages remedy in this context presents a question of first impression in the courts of the District of Columbia, and urges this Court, upon the reasoning of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and the concurring opinion of Judge Walker in *Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023), to recognize such a remedy. This claim is warranted by a nonfrivolous argument for extending existing law and for establishing new law.

252. As a direct, proximate, and foreseeable consequence of DEFENDANTS' violations of PLAINTIFF's constitutional rights, PLAINTIFF sustained loss, injury, and damage, including severe emotional and mental distress, and punitive damages are warranted.

**COUNT IX**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(ALL DEFENDANTS)**

253. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint.

254. At all times pertinent hereto, USADF was an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), engaged in, and whose activities affected, interstate and foreign commerce.

255. Each DEFENDANT is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), and each DEFENDANT is legally distinct from the enterprise. A natural person employed by a corporate or governmental entity is distinct from that entity for purposes of § 1962(c). *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).

256. Each DEFENDANT was employed by and associated with the enterprise, and each DEFENDANT conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs—occupying, as P/CEO, Acting P/CEO, Director of Financial Management, Chief Program Officer, and members of the committee performing the functions of the P/CEO, positions at the very apex of the operation and management of the enterprise—through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

257. The pattern of racketeering activity consisted of multiple related and continuous predicate acts of racketeering committed within ten years of one another, from at least June 2020 through at least 2025, including acts indictable under 18 U.S.C. § 201 (bribery and unlawful

gratuities), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud, including honest-services fraud under 18 U.S.C. § 1346), 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 1510 (obstruction of criminal investigations), 18 U.S.C. § 1512 (tampering with a witness, victim, or informant), 18 U.S.C. § 1513 (retaliating against a witness, victim, or informant), 18 U.S.C. § 1952 (interstate travel and use of interstate facilities in aid of racketeering), and 18 U.S.C. §§ 1956 and 1957 (money laundering), which allegations are incorporated in this Count as though fully restated.

258. ZAHUI committed, among others, the predicate acts of bribery, wire fraud, mail fraud, money laundering, obstruction, and witness tampering and retaliation. FELEKE committed, among others, the predicate acts of witness tampering and witness retaliation, including the suppression of the investigation report, the January 30, 2022 false statement to Federal law enforcement, and the March 14, 2025 publication. ADKINS committed, among others, the predicate acts of witness tampering and witness retaliation, including the January 21, 2022 suspension, the January 28, 2022 gag order, the sham investigation, and the FERC scheme. Each DEFENDANT committed at least two acts of racketeering within ten years of one another.

259. The predicate acts were related—sharing common purposes, participants, victims, and methods—and continuous, spanning a closed period of more than five years and constituting the regular way in which DEFENDANTS conducted the affairs of the enterprise, with a specific threat of continuation.

260. PLAINTIFF was injured in his business and property by reason of DEFENDANTS' violation of 18 U.S.C. § 1962(c). PLAINTIFF's injuries—the loss of his Federal salary, benefits, and retirement contributions; the loss of his subsequent employment and earnings; the loss of professional and business opportunities; and out-of-pocket costs and expenses—were the direct, intended, and proximate result of the predicate acts of witness tampering and witness retaliation

of which PLAINTIFF was the immediate and targeted victim. There is no more direct victim of those predicate acts than PLAINTIFF, and PLAINTIFF's damages are neither derivative nor speculative.

261. Pursuant to 18 U.S.C. § 1964(c), PLAINTIFF is entitled to recover threefold the damages he has sustained, the costs of this suit, and reasonable attorneys' fees.

**COUNT X**
**RICO CONSPIRACY, 18 U.S.C. § 1962(D)**
**(ALL DEFENDANTS)**

262. PLAINTIFF adopts and incorporates herein by reference as if specifically set forth herein the allegations of paragraphs 1 through 176 of this Complaint, and the allegations of Count IX.

263. DEFENDANTS, and each of them, knowingly agreed and conspired with one another, and with others known and unknown, to violate 18 U.S.C. § 1962(c)—that is, to conduct and participate in the conduct of the affairs of the USADF enterprise through a pattern of racketeering activity—in violation of 18 U.S.C. § 1962(d).

264. Each DEFENDANT knowingly agreed to facilitate a scheme that included the operation and management of the enterprise through racketeering activity, and each DEFENDANT adopted the goal of furthering and facilitating that endeavor, as evidenced by, among other things: ZAHUI's solicitation and acceptance of payments and his obstruction of the procurement review; FELEKE's authorization and then suppression of the internal investigation, her support of ZAHUI's refusal to produce procurement records, and her false statement to Federal law enforcement; ADKINS' execution of the removal that ZAHUI had arranged before ADKINS took office, his gag order, his memorandum to the USADF Board of Directors describing the investigation scheme, and his FERC scheme; the January 11 and January 20, 2022 coordination

calls in which ADKINS, FELEKE, and ZAHUI jointly participated with the Corporation's human-resources provider to plan PLAINTIFF's removal; and DEFENDANTS' coordinated publications.

265. In furtherance of the conspiracy, DEFENDANTS and their co-conspirators committed the overt and predicate acts alleged in Section U and Count IX, including the acts of witness tampering and witness retaliation directed at PLAINTIFF, each of which is itself an act of racketeering.

266. PLAINTIFF was injured in his business and property by reason of the conspiracy and by acts committed in furtherance of it that are themselves acts of racketeering, including the predicate acts of witness tampering and retaliation of which PLAINTIFF was the immediate target, as alleged above.

267. Pursuant to 18 U.S.C. § 1964(c), PLAINTIFF is entitled to recover threefold the damages he has sustained, the costs of this suit, and reasonable attorneys' fees, and each DEFENDANT is jointly and severally liable for the damages caused by the conspiracy.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF respectfully requests that this Court enter judgment in his favor and against DEFENDANTS ADKINS, ZAHUI, and FELEKE, jointly and severally, and award the following relief:

(a) Compensatory damages in an amount not less than Twelve Million Dollars ($12,000,000.00), or such greater amount as may be proven at trial, for loss of income, loss of earning capacity, loss of professional opportunity, injury to reputation, humiliation, and emotional pain, suffering, mental anguish, and loss of enjoyment of life;

(b) On Counts IX and X, threefold the damages sustained by PLAINTIFF, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

(c) Punitive damages in an amount sufficient to punish DEFENDANTS and to deter others from like conduct;

(d) A permanent injunction requiring DEFENDANTS to retract the false statements described herein and to cease and desist from further publication of the same or similar false statements concerning PLAINTIFF;

(e) Costs of suit and reasonable attorneys' fees to the extent permitted by law;

(f) Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

(g) Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

PLAINTIFF demands a trial by jury on all claims and issues so triable.

**VERIFICATION**

I state under penalty of perjury that I have read the foregoing Complaint against Travis Adkins, Elisabeth Feleke, and Mathieu Zahui filed in the Superior Court of the District of Columbia (Civil Division) on July 28, 2026 and the facts stated therein are true and correct.

Mateo Dunne

Plaintiff

Executed on July 28, 2026

Respectfully Submitted,

/s/ Philip Musolino

Philip M. Musolino
DC Bar No.: 294652
Musolino & Dessel, PLLC
1615 L Street, NW, Suite 440
Washington, DC 20036
Phone: (202) 466-3883
Email: pmusolino@musolinodessel.com